DAVIS RICH, *Administrator of* SALLY AUSTIN, *v.* GUSTAVUS A. AUSTIN.

[IN CHANCERY.]

*Chancery. Master and Servant. Accounting. Agency. Parent and Child.*

The orator's testatrix, in 1844, received a large property from her deceased husband's estate, the personal property amounting to over $100,000. The defendant, her son, had been living on the home farm with his parents for many years, had been the executor of his father's estate, and was familiar with the situation of his mother's estate. At her request he continued to live with her on said farm which was large, and the use of which had been bequeathed to her, under a contract that he was to aid and assist her, as her agent and servant, in the management of her estate, under her control and direction, for the compensation of $1,000. per year, and support of himself and family, but there was no time fixed that he should remain. He continued to live with his mother till her death in 1861, under said contract fulfilling on his part, and having the management of her property, and at her decease, as he alleged, gave to the orator "all demands due his mother, amounting to $141,452.17, which was the whole estate in his hands." His mother's papers and demands were kept in a safe in the house where she lived, to which she always had access, and she kept her own bank account, and objected to his keeping an account of family expenses. The defendant never rendered any account to his mother. *Held*, that, under all the circumstances of the case, the orator was not entitled to a decree for an accounting by the defendant.

Whatever in an answer is fairly a reply to the general scope of the claim set up in the bill, whether in the stating or charging part, and whether by way of denial, excuse or avoidance, is evidence for the defendant.

The allegation in the bill that the defendant received the property "to manage and improve, and cause to increase," is not a statement of such facts as constitute the relation of agent and trustee necessarily.

A denial in the answer of an allegation in the bill, that the defendant received, &c., the property as agent and trustee, without stating the terms upon which he did receive and manage it, would be evasive.

The arrangement under which the defendant was to aid and assist in managing the property was fair, and in no way unconscionable ; therefore, though made between parent and child, equity will uphold it.

As the defendant stood in the relation of servant, acting under his mother's direction and control, he is not responsible for losses, or unprofitableness of the farm.

The defendant appropriated to his own use a large amount of his mother's money, for which he executed his own notes, but with her consent and approval. *Held*, that this constituted no breach of trust in respect to her property or business.

Under the circumstances of the case the defendant was not bound to keep an account between himself and his mother.

• APPEAL from a decree of the Court of Chancery, Addison county, June Term, 1866, PIERPOINT, Chancellor, accepting the report of the masters to whom the case was referred,—from which both parties appealed.

The bill and answer, the report of the masters, and the evidence in the case, are sufficiently set forth in the opinion of the court.

*E. J. Phelps* and *Geo. F. Edmunds*, for the orator.

*L. P. Poland, J. Maeck* and *J. W. Stewart*, for the defendant.

The opinion of the court was delivered by

WILSON, J.   This is a bill in chancery wherein the orator alleges that the defendant has in his hands money and other property belonging to the estate of Sally Austin for which he ought to account.

The bill states: 1. That Mrs. Austin entrusted her whole real estate and personal estate to the defendant, as her *agent and trustee*, to manage and improve, and cause to increase, and that on or about the 1st of April, 1844, he received it, as her *agent and trustee*, for that purpose.   2. That the defendant, as such *agent and trustee*, took and held the possession of such real and personal estate during the life of his mother, Sally Austin.   3. That he took the profits to himself.   4. That without her knowledge and consent, the defendant took money and executed his own notes therefor, and she gave no assent thereto.   5. That by the defendant's unfaithfulness, negligence and misconduct, large amounts of the property were wasted and lost.   6. That the defendant rendered his mother no account of his agency or trust, but took all the profits to himself, and at her death, in April, 1861, all said property was in his hands unaccounted for.   7. That the defendant after his mother's death delivered to the orator as her administrator $63,000. in demands and his own notes for $43,000. as the property of her estate.   8. That there is a large amount of her estate still in the hands of the defendant or has been wasted by him, for which he has neglected and refused to account.   9. The bill prays

an account.   The answer sets forth, circumstantially, the terms and
conditions of the arrangement which the defendant says were made
between him and his mother, and by which he claims his management
of the property to have been governed.

The answer states :   1. That the defendant was to live with his
mother, in her house, with his family, and aid and assist her as her
*agent and servant* in the management of her property and affairs ;
that his family were to be supported by her, and he was to receive
one thousand dollars a year for performing such service, which he
was to perform under her direction and subject to her control.   2.
That he did live with his mother, and aided and assisted her in her
business as her *agent and servant,* under her direction and subject to
her control.   3.   That she was the head of the family, and every-
thing about the establishment was subject to her control and direc-
tion, and that her property and money were always subject to her
immediate control and always open to her inspection.   4. That he
performed the services required by his contract, and that his family
were supported and expenses paid out of his mother's property.   5.
The answer admits the defendant did not keep any accounts of the
receipts and expenditures of his mother's property, but states that
her demands and money were kept by themselves separate from his
own, which was known and approved by her, and that she expressly
prohibited any account of family expenses being kept.   6. That the
farm was managed under the direction of his mother, and the defend-
ant denies that he received any profits from it.   7. The answer
denies that the defendant was guilty of any misconduct, negligence or
unfaithfulness in performing his duty, the defendant admits there
were losses, but states they were communicated to his mother, that
she was satisfied with his conduct, and always said he was not in
fault and should not be held responsible.   8. The defendant admits
he received money of his mother, and gave his note therefor, but
says it was with her knowledge and consent.   9. The answer states
that the defendant gave the orator, as his mother's administrator, all
the demands due his mother, amounting to $141,452.97, which was
the whole estate in his hands.

It appears by the order of reference, connected with the stipula-

Rich, Adm'r, *v.* Austin.

tions of the parties, the masters were to report all facts established by the evidence before them. Under such reference, the facts reported by the masters are the facts to be considered by the court in the determination of the cause, so far as their finding is based upon proper and legitimate evidence, in the same manner as if the facts had been found from the evidence by the court. The general question in the case is whether the defendant should be held to account any further, and upon this question the first important inquiry relates to the contract under which the defendant became connected with and managed the property for his mother. It is claimed by the orator that the defendant received the property as *agent and trustee* of his mother, that he managed it as her *agent and trustee,* that the defendant became *debtor* to his mother for the whole property, and as such debtor, should account for the same, together with the increase and interest. The defendant insists that his relation was that of agent and servant, that he acted under her directions and control, that by his management of the property, under her direction and control, he did not become debtor to her for the property, except such as he appropriated to his own use, and for which he executed to her his notes; that he has delivered to the orator, as Administrator, the whole estate in his hands, and that he is not bound to account any further. In regard to the contract under which the defendant became connected with the property, the masters find and say : " At or about this time, (April, 1844,) the testatrix desired that the defendant should continue to reside with her and aid and assist her in the management of her property, saying that if he would do so, she would support him and his family and pay him $1000. a year, to which the defendant assented, but there was no time fixed that he should remain. That there was any such agreement as this was denied by the orator, but from the condition and relationship of the parties, the circumstances and evidence in the case, independent of the answer we have felt compelled to find the agreement as stated." It is urged by the orator's counsel that the evidence in support of the contract is insufficient to sustain it ; but we are entirely agreed that the evidence fully warrants the finding of the masters. The circumstances existing at the time the alleged arrangement was entered into,

render it probable that the defendant and his mother would make, and the testimony of several witnesses introduced by the defendant tend to show they did make, the contract set forth in the defendant's answer. It was for the masters to judge upon the credibility of the witnesses, upon the weight and sufficiency of their evidence, and we think they might legitimately find from the evidence, the contract fully established. The defendant's answer, we think, is evidence in support of the contract. It has been repeatedly held that whatever is fairly a reply to the general scope of the claim set up in the bill, whether in the stating or charging part, and whether by way of denial, excuse or avoidance, is evidence for the defendant. *Adams* v. *Adams*, 22 Vt. 68 ; *Woodcock* v. *Burnell*, 1 Cowan, 744 ; *Dunham* v. *Jackson*, 6 Wend. 22 ; *Jackson* v. *Hart*, 11 Wend. 343. It is said by the orator's counsel that the answer is no evidence of the contract, because it admits the confidential relations of the parties and the reception of the property, and undertakes to avoid the just consequences thereof by setting up affirmatively a special contract. This proposition cannot be sustained in view of the pleadings and evidence in the case. The bill states that Mrs. Austin entrusted her real and personal estate to the defendant, as her *agent and trustee*, to manage and improve and cause to increase, and that the defendant, as such agent and trustee, took and held possession of her estate during her life. The bill states generally, that the relation of the defendant was that of *agent and trustee*, but it does not set forth a contract or facts from which it would follow as matter of law, that the defendant ever stood in the relation of trustee. The allegation in the bill that the defendant received the property " to manage and improve and cause to increase," is not a statement of such facts as constitute the relation claimed by the orator, because the defendant might have received the property for the purpose named in the bill, but under a contract which would constitute the relation of agent and servant, and not trustee. The bill, therefore, by reason of its omission to state the terms of the contract under which the defendant was connected with the property, rendered proper the aid of subsequent pleading, as well as the evidence, in order to determine the nature of the defendant's undertaking and the extent of his liability. That property

which belonged to his mother had been in the hands of the defendant was not disputed by him; the main question in dispute related to the terms of the contract under which he received and managed the property. Whether the defendant was liable to account any further, and the extent to which he would be held to account depended, to a very great extent, upon the character of the relation created by the contract, and the manner in which he managed the property  The bill not only stated that the defendant, as *agent and trustee* of his mother, received and managed the property, but it called on the defendant to answer, "whether he did not on or about April 1st, 1844, become the *agent and trustee* of the said Sally Austin, and as such receive for her and her's all said real estate and personal estate so belonging to her." Now a mere denial by the defendant that he became the agent and trustee of his mother, or that he received the property as such, without stating in his answer the terms of the contract under which he received it, would amount to nothing more than his opinion as to the legal consequence of facts not disclosed by the pleadings. But the defendant in his answer denied the relation stated in the bill, that is to say, he denied that he received or managed the property as trustee of his mother, which was responsive to the bill. The answer then sets forth the circumstances under which the defendant became connected with the property, and the terms of the contract under which he, as her agent and servant, aided and assisted her in the management of her property and business, under her direction and control. The answer contains a statement of facts which constitute the relation of a *servant* and not trustee. The answer does not confess the relation charged in the bill, and undertake to avoid that relation, but it states the terms of the contract which of themselves define the true relation.

The claim, set up in the bill, rests wholly in oral proof, and the answer of the defendant is invoked to make out the orator's case. It is clear that the orator by omitting to state the terms of the contract upon which the relation and liability of the defendant depend, could not compel the defendant to try the case upon an issue formed by a denial merely of his relation as trustee, nor deprive the defendant of the benefit of his answer as evidence of the contract therein set forth,

Rich, Adm'r, *v.* Austin.

The defendant's own protection, as well as the stating part of the bill, required him to set forth the true contract out of which his relation arose ; and a denial merely of the relation charged, without setting forth the terms upon which he did receive and manage the property, we think would be considered evasive. It is insisted by the orator that the contract set up by the defendant is unreasonable and unconscionable in its character, and cannot be upheld in a court of equity. The reasonableness of the contract must depend to a considerable extent on the situation of the property, and the situation and relation of the parties at the time it was made. These matters and other facts upon which the equity of the contract rests, are fully disclosed by the master's report. It appears that for some years next before the death of Apollos Austin, the defendant had lived with him and assisted in the management of his property. Apollos Austin died, testate, in December, 1842. The defendant was executor under his will, and by this will a large amount of personal property was bequeathed to the said Sally Austin, as well as the use of a large farm and stock. The defendant, after his father's death, continued to reside with his family, with his mother, on the home farm, and where his father resided at the time of his death, up to April, 1844, during which time the demands belonging to the estate of his father remained in the possession and under the control of the defendant as executor. At this time the children and heirs made a division of the demands and property of Apollos Austin, between themselves and their mother, by which division and distribution each and all the children and heirs received what, in this State, would be considered a very respectable property if not an independence. Upon that occasion about $100,000. of the estate of her late husband, an estate which had been earned by his and her industry and frugality, was set to her as her own property. It then became her property to manage, control and dispose of as she should see fit. She was well acquainted with the use and value of property ; a long life of industry and plenty had fitted her to guard against the self delusion, extravagance and improvident acts which too often result from sudden transition of persons from a state of poverty to wealth, who are unaccustomed to habits of industry and ignorant of the use or

Rich, Adm'r, v. Austin.

value of property. She did not need or desire to increase her wealth. She had arrived at the age requiring some relaxation from her accustomed labor, but from her long experience in the pleasures and benefits derived from actual participation in the management of property, she, very sensibly, chose to continue the " head of the family" and the director of her own estate, as the surest means of enjoying the remnant of her life. To manage and control so large an estate, she required the aid and assistance of a faithful servant. She had, for a great many years, been acquainted with the business capacity and habits of the defendant. He was familiar with the situation of her estate, and could render her essential service in the management of it. The defendant had always lived with her, his children were born in her house, and very likely as dear as her own, and it would seem it was indispensable to the happiness and comfort of the remainder of her days that they should continue to live as they were. It appears she had good reason to believe the defendant would be faithful in her business. From these causes fully established by the evidence, we may fairly account for the desire expressed by her, " that the defendant should continue to reside with her, and aid and assist her in the management of her property," and for the offer made by her and accepted by the defendant. That she had a legal right to enter into an arrangement with the defendant, by which he should aid and assist her in her affairs, is not questioned. It is not found by the masters, nor is there any evidence in the case tending to prove the defendant exercised any influence over her in the making of the contract, but the evidence leaves no doubt that the terms of the contract were her own voluntary offer. But it is said by the orator's counsel the provision for compensation is unreasonable, that this part of the contract should be held invalid. Whether the agreement as to compensation was unconscionable must depend upon the circumstances then surrounding the parties, their relation, and upon the nature, amount and responsibility of the service to be performed. It is conceded that she then had, and would continue to have, the management and control of large farming interests. She was then the absolute owner of more than $100,000. of personal property. It is clear that by reason of her age, and such disability as is usually inci-

dent to the sex, she could do but little more than direct her servant in respect to the management of her estate.

In view of the nature and amount of the property, it must have been understood by the parties that a large amount of service would be required of the defendant under the contract, and that the faithful management of the estate would require all, or nearly all, of his time. The defendant, at that time, was a young man of large means of his own, requiring attention and care. He was at liberty to remain in Orwell, or go where he could more profitably invest his property. He might infer from the language of her offer, it was her desire he should continue to reside with her during the remainder of her life, and, by accepting the offer, he would place himself under obligation to continue in her service so long as she should need or desire him. He must have understood the proposed contract, if entered into, might require him to continue his residence at that place for many years, and limit his opportunities for improving his own estate. He could not afford, for a small compensation, to spend that part of his life in his mother's service, which must be the most necessary and useful for him to attend to his own affairs. All this was fully understood by both parties; they would, therefore, be likely to consider the proposed arrangement, with special reference to their mutual interests in a pecuniary point of view. The defendant, if he performed the service required by the contract, would be entitled to a liberal compensation; she had the means of paying him liberally, and desired to do so. It is clear that she had sufficient capacity to make the contract in question; and it is clearly established that she not only knew of, but comprehended the terms of the contract thoroughly. The one thousand dollars a year was specific, and the remaining part of the compensation, viz: the support of his family, was a matter entirely within her comprehension. She had had large experience in respect to the expenses of supporting her own family; the defendant and his family had lived with her for many years, and from her own personal knowledge of the expenses of supporting his family in connection with her own, she could judge with reasonable certainty as to the amount of compensation offered. Whether it would cost less than $1,500. or more than 2,000. dollars,

Rich, Adm'r, v. Austin.

annually, to support the family, was a matter resting, to a very great extent, in her own discretion and choice. She was the head of the family, and as such could direct their reasonable support. The reasonableness of the provision for compensation cannot be determined or affected by the amount of family expenses actually incurred by her liberality and direction, but the value of this provision of the contract depends upon, and should be determined by, the necessary cost of supporting his family, in view of their number and what they would actually need, and the assistance they should render her in the business and for her comfort. She knew the remuneration was liberal, and, we think, the defendant, without any violation of conscience, might, under the circumstances, accept the compensation provided by the terms of the contract. It will be seen that this contract did not bind her to continue the defendant in her service any longer than she should need and desire him; she could at any time, upon reasonable notice, have discontinued the contract. Looking at this question as presented by the pleadings and proofs, we have failed to discover any evidence of fraud, or undue influence, and it seems clear there is nothing in the terms of the contract tending to show a hasty or weak judgment on the part of the testatrix. We think it is established by the evidence that the arrangement was fair, and in no way unconscionable. It is true that, to guard against the strong influences which the relation of parent and child are so apt to originate, the law not only watches over the transactions of the parties with great and jealous scrutiny, but it often declares transactions absolutely void, which, between other parties, would be open to no exception. There is, however, no principle or motive of general policy which can justify holding a contract invalid on the ground merely, that the parties to it are parent and child; but when it is affirmatively shown that the contract was fair and conscionable, beyond suspicion, equity will uphold it. A different rule might be productive of infinite mischief; persons standing in such relation would reluctantly enter into any arrangement involving any considerable amount of property, however necessary such arrangement might be for the interests and happiness of the parties, if liable to be set aside whenever the interests of other kindred dictate. Such a rule

would, in many cases, unjustly separate parents and children, and compel them to seek the society and assistance of strangers.

The next question is whether the defendant served under and substantially performed this contract on his part. The bill charges that the defendant as agent and trustee received the property ; but the masters find that the property, including the demands, went into the hands of the defendant under the arrangement and contract set forth in the defendant's answer, and we think their finding is fully sustained by the evidence. The bill charges that the defendant has had the possession, control and management of the real estate, and has taken the profits to himself and has made large gains thereon. This is denied by the answer, and the masters find, in relation to the management of the farm that " the testatrix gave directions from time to time with which the defendant complied," from which they conclude that the testatrix, and not the defendant, was responsible for the manner in which it was carried on. The masters say, " we are of opinion, from the evidence as to the manner in which the farm was managed under the direction of the testatrix, and taking into consideration the losses which the evidence showed were sustained from the death, disease and shifting of stock, and from other causes, as well as the expenses of building, repairs, &c., that nothing was, in point of fact, realized from the farm during the period embraced in the account, but that on the contrary, a positive loss was sustained." We do not deem it necessary to examine the evidence very much in detail, upon which this finding of the masters is based. The answer is strictly responsive to the bill in respect to the avails of the farm. The answer states that the defendant never, at any time during all the period of his service, appropriated to his own use or benefit any of the products of the farm, save as the same were applied to the support of the family, agreeably to the contract and understanding set forth in the answer, or by her express license and gift ; that so far as the farm was personally managed by the defendant, the same was carried on according to his best judgment; that he, from time to time in the management of the farm, consulted with his mother, and in all cases conformed such management to her wish and direction as to the kind and quantity of stock advisable to be kept thereon,

and that she was at all times fully cognizant of the mode of management and the stock kept upon the farm, and never expressed any dissatisfaction with reference thereto. In regard to the farm as a a source of profit or loss, it appears that a large number of witnesses testified as to the average value of the use of the farm, during the period of the defendant's employment, and as to losses sustained from the several causes named in the report. The witnesses upon this branch of the case profess to have had personal knowledge of the farm, of the manner in which it was managed, and under the direction of the testatrix, and of the losses alleged to have been sustained, and we think the masters might find, by a fair balance of evidence, just what they have found, viz : " that nothing was in point of fact realized from the farm during that period." But from this finding it does not follow that the unprofitableness of the farm resulted from negligence or want of care of either mistress or servant. In disposing of this part of the case, it is sufficient to say that there is no evidence tending to show that any of the losses, referred to in that part of the report above quoted, resulted from negligence or want of care on the part of the defendant, and standing as he did in the relation of servant, acting under her direction and control, he is not to be made responsible for such losses. The proof is abundant to show it never was contemplated by the parties that he should be made accountable for losses sustained without his fault. No express stipulation was necessary to protect him from such losses ; that such losses should be sustained by the testatrix, follows as a legal consequence of his relation.

In regard to the demands of the testatrix, which went into the hands of the defendant, the masters say : " We find that she relied mainly on the defendant. She was an old lady, and for want of the requisite knowledge of managing demands, she relied on the defendant to take the control and management of them." Upon the evidence it is clear that she trusted to the judgment and discretion of the defendant in the management of her demands, except in a few instances where she gave the defendant special directions in respect to interest and extension of time of payment. No question is made but that, in the distribution of the estate of Apollos Austin, the

doubtful demands were, by mutual consent, set to his widow, (the testatrix,) and these demands, together with those against solvent debtors, passed into the hands of the defendant, and he had the care and management of them for his mother. It is obvious that, under the most judicious management of the demands, losses might have been anticipated, and would be realized, and it appears that, losses to some extent did accrue in the collection of some of the claims, by reason of the insolvency of debtors; but in view of the amount and situation of the demands, it is evident the losses are small when compared with the aggregate amount of the claims, and this circumstance tends to show that the defendant, in his efforts to secure and collect the debts due to his mother, was faithful, and exercised a sound judgment and discretion. The aid and assistance rendered her by the defendant in the management of her farm, and in the control of the demands and other personal property, appear to have been in accordance with the contract and understanding of the parties as set forth in the answer. It does not appear that the defendant ever assumed a position hostile to his relation as her servant in the management or control of her property. But it is said by the orator's counsel that the testatrix was incapable of any material concern in the management of her property; that the evidence tends to show but few instances wherein she directed the defendant in respect to the management of her business; that the whole business was done by him, and some of it without her interference, or even knowledge. These positions deserve some further notice.

We regard it clearly established by the evidence that the testatrix, at the time of making the contract set forth in the defendant's answer, was capable of selecting a competent agent or servant to aid and assist her in the management of her property generally. She had personal knowledge of the defendant's business experience, and that he was well acquainted with the nature and situation of her property; she believed that in so far as she should give him special directions, he would follow them, and in matters left to his judgment and discretion, he would act the part of a faithful servant. The defendant had resided on her farm for more than a quarter of a century, during the greater part of which time he had aided and assisted

his father in the management of it, as well as of his business generally. He had had an opportunity to inform himself as to the adaptation of the farm to the different kinds of grain, and the amount of stock its average crop of grass would keep. He was familiar with her ideas as to the management of farming interests; he was acquainted with her demands, and knew better than the testatrix could tell him, what would be required of him in their management, care and collection. All this was understood by the testatrix, and it is evident that these considerations had their influence in her choice of the defendant as her servant. So far as the contract related to the service to be performed by the defendant, its provisions were plain, and no one capable of making such a contract could have any doubt as to the intention of the parties, nor as to the obligation or general duties of the defendant under it. The defendant agreed to reside with his mother, and to aid and assist her, as her servant, in the management of her property and affairs, under her direction and control. By the express terms of the contract, the defendant was not only authorized, but directed generally, to aid and assist his mother in her business. He commenced service, under the contract, with more knowledge of her property, and with more experience in respect to its proper management than she ever had, or possibly could obtain in relation thereto, and continued in her employ the remainder of her life. His superior knowledge of her business, and of the manner in which it should be managed, and his general knowledge of the manner in which she desired to have it managed, rendered it unnecessary for her to follow him daily with directions as to its management, and unnecessary that he should consult her as to the management or control of business, in relation to which he could derive from her no information. The testatrix gave directions, from time to time, in relation to the management of the farm and stock, with which the defendant complied. The referees find that she did not have, or claim to have, the requisite knowledge of managing her demands; that she relied mainly on the defendant to take the control and management of them, for her, and in this matter she trusted to the judgment and discretion of the defendant. This discretionary power of the defendant, in respect to the property, enabled him, as her servant, to man-

age her business, free from the embarrassments which must have resulted from requiring special instructions as to each particular transaction. She found no occasion to repeat instructions already given to him, and they were sufficient authority for him to manage her business until further and different instructions had been given. The fact that all, or nearly all, her business was done by the defendant, is perfectly consistent with his relation, as her servant. The contract made it his duty to take care of her property, and to perform all the service which her business and interests, in his judgment and discretion, required. It was for these purposes she invited him into her service. His continuing authority to manage her business according to his best judgment and discretion, was derived from the contract, and so far as the defendant acted within the scope of his authority, his acts must be regarded as her acts, the same as if she had given him special directions in respect to their performance.

The bill states that the defendant appropriated to his own use, without the knowledge or consent of his mother, large amounts of her property, and made his own notes therefor, payable to her, which he kept professedly as evidence and vouchers of his duties as her agent and trustee, but of which she had no knowledge, and to which she gave no assent. The masters find that while the defendant had the control and management of the demands and was acting for his mother in their management, he appropriated to his own business her money collected on them, to the amount of $43,721,39. and executed his own notes payable to her for that amount. In regard to the question whether the defendant appropriated the money, with or without her knowledge or consent, the masters say, "if the defendant's answer is responsive to the bill in this particular, and we have treated it so, then we find that the money taken by the defendant and for which he executed his notes to his mother was so taken with her knowledge and consent. It seems clear that the answer is strictly responsive. The bill states that the defendant appropriated to his own use, her money and executed his own notes therefor, without her knowledge or consent, and to which she gave no assent. The answer positively denies that the defendant appropriated to his use, her money and executed his notes therefor without her knowl-

edge or assent; the answer then states that the defendant borrowed the money of his mother and executed his notes therefor, and that the same were approved by her. It further appears from the evidence, independent of the answer, that she subsequently assented to and ratified the use of the money by the defendant, and she assented to his notes, for the money so appropriated by him. We think, therefore, that the use of the money by the defendant, for which he executed his notes, constitutes no breach of trust in respect to her property or business.

It is alleged that the defendant rendered his mother no account of his agency or trust, but took all the profits to himself; that at her death all said property was in his hands unaccounted for, and that a large amount of the property is still in his hands unaccounted for. The answer not only denies these several statements in the bill, but contains on all these points a statement of facts which tend to disprove these allegations of the bill. The defendant insisted before the masters that his answer, in all these respects, was responsive to the bill and therefore evidence, and he further insisted that there was no evidence in the case sufficient to overcome the answer. The masters find that the answer is not disproved in these particulars, and they say, " if the answer is responsive to the bill, in the judgment of the court, then we decide that the defendant should not be held to account any further," unless the neglect of the defendant to keep and render an account under the circumstances should in the judgment of the court require it. The charges in the bill, in respect to which the masters find that the answer is not disproved, are specific ; and they relate to the acts of the defendant as the servant of the testatrix. They raise the questions whether the defendant in good faith and with common diligence, discharged his duties as such servant; whether he appropriated any of the property to his own use without the consent of the testatrix ; and whether he has accounted for all her property. These charges in the bill and the answer thereto, should be considered in view of the defendant's relation to the property. He could not fully or fairly answer the charges by simply denying them, but the orator could claim, and the rights of the defendant demanded, that he should not only state whether the

Rich, Adm'r, *v.* Austin.

charges were true, but also state the character of his acts, in respect to the property, tending to prove or disprove the allegations of the bill. The first point of inquiry involved in this branch of the charges in the bill is, whether the property was wasted and lost through any fault of the defendant. The answer on this point is positive, specific and full. It states that the defendant did not waste and squander the property of the testatrix, nor permit it to be wasted and diminished by want of care and attention. These statements in the answer constitute a denial of the charges of unfaithfulness, negligence and misconduct and are responsive. The answer further and more fully denies these charges, by stating that the defendant was faithful and attentive, and that he exercised his best skill and judgment in the management of the property. These allegations of the answer not only constitute a denial of the charges in the bill, but they contain *facts* which the law presumes are true in the absence of proof to the contrary. The answer denies that the defendant appropriated to his own use any of the property of the testatrix, without her consent. As to the charges in the bill that the defendant took the whole profits to himself, and rendered his mother no account of his agency or trust, they are denied by the answer, in which the defendant states when and how he accounted for the property, and for the profits thereof. It seems clear from the evidence that the testatrix, before and at the time of her death, had the legal possession and control of her property. She resided in her own house, in which her money and demands were kept, all which was subject to her control. The defendant resided with her, he was her servant, and his possession or custody of the property, before and at the time of her death, was that of a mere servant. The answer states that the defendant surrendered up to the orator all the property belonging to his mother's estate in his hands or possession. In Vernon case 127 it was held, "that if a man by answer swear that what he received he received as a menial servant, and hath paid over to his master, he shall not be put to account again, but he ought to disclose the matter in his answer." So in Vernon case, 208, "on exceptions to master's report which had reported the answer insufficient, the LORD KEEPER declared that it was sufficient for a servant or apprentice in

his answer to a bill for an account to say in general that whatever he received was by him received and laid out by his master's orders." It is upon the principles enunciated in these cases that the defendant insists in, and by his answer that he should not be held to account any further in the premises ; and if the answer is responsive in these respects the masters find he should not. We are agreed that it is. One special question submitted by the masters is, whether the neglect of the defendant to keep and render an account under the circumstances entitles the orator to decree for an accounting.

It has been laid down as a rule in the Court of Chancery not to be departed from but upon very special circumstances, that an agent is bound to keep regular accounts of his transactions on behalf of his employers ; not only upon his own part, accounts of payments, but also on the part of his employers, accounts of his receipts. A servant or clerk is not generally required by his employers to keep accounts as between himself and them of transactions on their behalf with third persons. The chief object to be sought in requiring an agent or servant to keep accounts between himself and his employers, of transactions on their behalf with third persons, is to secure the best evidence that such agent or servant has acted in good faith with the requisite degree of diligence and judgment in the discharge of his duties in view of the interests of his employer. The manner of keeping and rendering accounts between agents and servants and their employers, is a matter which the parties may regulate, and usually do regulate by express contract ; and circumstances may exist, arising from special contract, from the character of the agency or service, or from the manner of keeping the property, which would wholly excuse the agent or servant from keeping accounts at all. It appears from the facts reported by the masters that the defendant's employment was rather a service than a trust. The important inquiry is, whether the defendant, under the circumstances of this case, was bound to keep an account of his transactions as the servant of the testatrix.

The answer alleges that " the defendant did expect, and so the said Sally expected, (and it was all either of them ever expected the defendant to do, so far as any accounting was concerned,) to keep

her moneys, evidences of debt and property, separate from that of all other persons, his own included, for her sake and benefit, and to deliver the same up to her sole use and custody, and direct personal control, whenever she should desire it, all which the defendant avers he has done." We think the answer, in these particulars, is not disproved. The masters find that all her demands were kept in the safe, in her house, where they had always been kept; that she had access to her demands whenever she desired, and that in a few instances she gave directions about them, but that she generally trusted to the judgment and discretion of the defendant. They find that soon after the defendant entered upon the management of his mother's property, his wife commenced keeping an account of the family expenses, and when this came to the knowledge of the testatrix, she objected to it, and said she did not wish such an account kept, and thereupon no further account of such expenses was kept. He was bound to act in good faith, to exercise common diligence, and his best skill and judgment, in the management of her property, under her direction, and to take care that her money and demands were kept separate from his own, in the proper place furnished to keep them. In these particulars, there is no evidence of any failure or neglect on the part of the defendant. He had no exclusive possession of the property; he had no legal possession of her demands. He lived in his mother's house, of which she had control; her demands were kept in the safe where they had always before been kept, and they were kept separate by themselves. Her money was kept separate in the safe, and when it was kept in the bank, she had a separate bank account. She had the sole right of control, and sometimes exercised it. She knew that her money and demands were kept in the place furnished for that purpose, and that, by reference to the papers themselves, the money received and paid out, the demands given up or taken, could always be determined. The testatrix's direction, not to keep any account of the expenditures for the family, affords strong evidence that she did not require the defendant to keep, nor expect he would keep, any account, as between them, of his transactions. She must have understood that, without an account of the family expenses, the defendant could not state an accurate account; that he could not render an

accurate account of all the money, and other property, which had passed through his hands, as her servant, and that she could not justly require the defendant to account any further than to surrender to her that part of her property which had not been paid out by him, by her orders, or in her business. The defendant did not become debtor for any of her property, except such as he appropriated to his own use, and that was embraced in his notes ; consequently there was no relation of debtor and creditor requiring the defendant to keep a book. We are of opinion that the defendant, under the circumstances, was not bound to keep an account between himself and his mother. The neglect of the defendant to keep an account, under the circumstances, lays him open to no unfavorable presumption, and should not operate to his prejudice. It is clear, we think, that the defendant did account to his mother, from time to time, in her lifetime, for the property then in his hands, as her servant ; he rendered, to her, all the account she could reasonably require, and all the account the situation of the property and circumstances called for. The defendant accounted to her in the usual manner in which servants are required to account to their masters. Her property had not been intermingled with that of any other person, but was kept separate. She was in possession and control of her farm, stock and other property belonging on the farm, and she had the legal possession and control of all her personal property, including her choses in action. If the testatrix had, just before her death, or at any other time, dismissed the defendant from her service, or if he had left her service of his own choice, she could only have acquired, by way of accounting, that the defendant should leave with her what remained of her property. This is all the accounting she ever expected, and all she could in equity have required. It is evident that no other rights or liabilities existed at the time of her death, and at that time she could not have maintained an action against the defendant for a further accounting. These views bring us to the conclusion, that the neglect of the defendant to keep an account, under the circumstances, does not entitle the orator to a decree for an accounting.

We are of opinion that the orator is not entitled to the relief prayed for, and that the defendant has sufficiently accounted. The result is

that the decree dismissing the bill is affirmed, and as it is suggested by the orator's solicitor that there may be a question as to whether the statute could not be pleaded at law to the notes of the defendant which he has delivered to the orator, the cause is remanded to the Court of Chancery with instructions to the Chancellor to make a decree for the defendant, dismissing the bill with costs, on the defendant's executing a satisfactory waiver in writing of the statute of limitations as to the said notes.