(15 App. Div. 47.)
### HAMILTON v. HAMILTON.

(Supreme Court, Appellate Division, Second Department. March 9, 1897.)

1. PRINCIPAL AND AGENT—ACCOUNTING—EVIDENCE.

A son who has had entire charge of his father's undertaking business for several years, keeping the funds in bank in his own name, should only be required to account for such disbursements as were made by checks to his own order, or apparently for his own benefit, though no books of account of the business were kept, where it appears that the business was formerly carried on without books, and in a very careless manner, by the father, who was illiterate; that the son was taken into his father's employ when 15 years old; and that when given the entire management, about 10 years later, he continued with the same business methods, and there are no unexplained acquisitions of property by the son.

2. SAME—PAYMENT FOR PRINCIPAL'S BENEFIT.

In such case, the son should not be charged with money expended to maintain a grocery business which was assigned to him to secure a debt due the father, where at least some of the proceeds of such business were paid into the undertaking business, though there was no account of such proceeds, since payments on account of the grocery business were prima facie for the father's benefit.

Appeal from judgment on report of referee.

Action by Henry Hamilton against William H. Hamilton for an accounting, and to impress defendant's property with a trust in favor of plaintiff for money misappropriated. From a judgment in favor of plaintiff, defendant appeals. Modified.

Argued before GOODRICH, P. J., and CULLEN, HATCH, and BRADLEY, JJ.

James W. Ridgeway, for appellant.
Josiah T. Marean, for respondent.

CULLEN, J. The plaintiff, among other business ventures, carried on the business of an undertaker in the city of Brooklyn. The defendant is the plaintiff's son. In the year 1872, when the defendant was about the age of 15 years, the plaintiff put him at work in that business, where he continued until the year 1893, when he left his father's service and started a rival establishment. In January, 1888, the defendant, by his father's direction, opened an account in a bank, in which deposits were made from the proceeds of the business, and out of which, to some extent, the expenses and other obligations of the defendant were paid. Subsequently another account was opened in a trust company. After defendant left plaintiff's service the plaintiff brought this action, alleging that defendant had failed to account for the moneys received by him, and had converted large portions of them to his own use, and invested the same, or part thereof, in certain real estate; and he prayed that defendant account, and that, for any sum found due from him on an accounting, such real estate be impressed with a trust in favor of the plaintiff. The learned referee found the defendant liable for the sum of $18,319.57. Upon this report a judgment was entered in favor of the plaintiff, directing the sale of the defendant's realty, and the recovery by plaintiff of any deficiency that there might be after applying to his claim the proceeds of the sale. From that judgment this appeal is taken.

The record before us is quite voluminous, and presents to us a vast number of items of payment by the defendant, with which it was sought to charge him.    The able and painstaking referee before whom the case was tried has written an elaborate opinion upon the questions disposed of by him.    So far as he has charged the defendant with misappropriation of the plaintiff's funds, though a very large number of separate items are involved, he has divided them, and correctly divided them, into a few distinct classes; and the question of the defendant's liability, both on the proof and law, as to each item of the class, is substantially identical.    The complaint in the action was doubtless modeled upon that in the case of Ferry Co. v. Moore, 102 N. Y. 667, 6 N. E. 293.    The trial of the case, also, to some extent, proceeded on the same lines as those of the case cited.    It was attempted to show that the plaintiff's business of undertaking realized greater profits after the defendant left his service than while he was employed, and also that the defendant had, during the period of his service, acquired property of greater value than could be accounted for by his income. . It is not necessary to review further this aspect of the case, as the finding of the referee that the defendant appropriated the plaintiff's money did not proceed on any such theory.    He found, on the defendant's request, that at the time of the opening of the bank accounts the defendant was possessed of property of the approximate value of upward of $6,000, and that when the defendant left the plaintiff's service the property of the former was of the approximate value of $10,665.    Hence the defendant, during this period, increased his wealth by a sum less than $4,700, while the finding is that he appropriated upward of $18,000.    Therefore the finding was not based on any proof of unexplained acquisitions by the defendant.    In his opinion, also, the referee states that the books and records of the business were of such a character and so kept that it was not possible to ascertain what the real condition of the business was, and that it could not be told whether it was profitable or otherwise.    It appeared on the trial that a great number of checks were drawn by the defendant, either to his own order or to the order of other parties, to whom they were paid away, for the defendant's personal benefit, or on his account.    As to these checks the referee held the defendant to proof that they were expended on his father's account, and where he failed to adduce such proof, or satisfactorily explain the checks, he charged the defendant with the amount.    We think the rule so held by the referee was correct.    The method in which the plaintiff's business was carried on was careless, unsystematic, and disordered, to a degree difficult to appreciate.    The plaintiff, though a man of considerable business ability and shrewdness, was unlettered; being able to write his own name, but unable to read writing.    He was carrying on many business operations besides that of an undertaker.    Though possessed of considerable property, he was always straitened for ready money.    He was always borrowing money from his neighbors, even in small sums, and oftentimes returned the favor by lending them money.    He would let his checks and notes go to protest, and suffer judgments to be recovered against him.    He was so careless in these matters that banks refused

to take his accounts, and it appears that for this reason an account was opened in the name of the defendant. He had no regular books kept for him, and he testified that he kept all his business matters in his head. One can cultivate by training the faculty of memory to a very great extent, and doubtless the plaintiff had done so, but his memory, however cultivated, could not be a certain reliance; and he was unable, on the witness stand, to state whether he owed $20,000 or $50,000 at the time the defendant took the business. All this is said, not in criticism of the plaintiff, for he had a right to do business, even if he were uneducated, and he had the right to do business even carelessly. It reflects credit upon him that despite these disabilities he was able to do a large business and acquire property. But this narration had a great deal to do with the conduct of the defendant, and the responsibility which should be imposed on him. The defendant was taken into the business carried on by his father in the way stated at the age of 15. He could have had no knowledge or experience in the keeping of books, and certainly he could not acquire any in a business so conducted. There were no books of account,—apparently, not even a cash book. There was an order book, upon which orders were entered, and when the services were paid for the entry in the order book was marked "Paid." The current bills and wages of the men were paid out of the cash in the safe, or money borrowed for the purpose, as well as by check, and no entry of such payments seems to have been made. All this was done with money received and money paid, not by the defendant alone, but indifferently by the defendant and his brother George, on the trial a witness for the plaintiff, with the one exception that the defendant alone drew the checks. The defendant, besides his services in the office or shop, embalmed bodies and attended funerals. With such a business education as the defendant received, and with such duties as he had to perform, it is not singular that his methods of account were the very worst, and no such presumption of wrongdoing arises from his improper method of keeping accounts as would in the case of a clerk in an ordinary employment. It is true that this method of doing business offered the amplest opportunity of dishonesty and fraud on the defendant's part, but the plaintiff, not he, was responsible for the method. It may be that the plaintiff has been defrauded of large sums, the appropriation of which he is unable to establish; but this inability is either his fault or his misfortune, and cannot be made the ground of liability by the defendant. The learned referee was therefore correct in holding the defendant to account only for such payments as prima facie were made for his benefit.

But, in the case of one class of payments with which the referee has charged the defendant, we think he has erred. In the fall of 1889 one Harrington, a neighbor and friend of the parties, carrying on business as a grocer, found himself involved, and assigned two grocery stores which he owned to the defendant. Harrington and the defendant both testified that at the time of the assignment Harrington was indebted to the plaintiff in the sum of $1,005, and that the assignment was made to the defendant to pay the father's claim. The plaintiff denies that Harrington owed him any money at the time, or that he

was anywise interested in the transfer of the two stores. From his opinion it would seem that the referee has held against the plaintiff on that question, and found that Harrington did owe him the amount stated. After this transfer one of the stores was closed, and the stock sold out. The business at the other was carried on for about two years. There is a series of checks drawn by the defendant during the continuance of this business to pay various persons who from time to time sold goods for use in the grocery store. These checks number nearly 300. For their amount the referee has held the defendant liable, finding that they were paid for his individual benefit. The defendant testified that the receipts of the grocery store were all paid in to the undertaking business, and exceeded in amount not only the payments on account of the store, but also the debt of $1,005 due to the plaintiff. He testified that he had a book in which was entered these receipts, and also the payments made on account of the grocery store, which book he states he left at the plaintiff's office. The referee has found against the defendant on the question of the existence of such a book, but it is unquestionable that to some extent the receipts of the grocery store were applied on the plaintiff's account. During the period the defendant held the grocery store the business was carried on there by Harrington as clerk, the defendant remaining at the undertaker's shop. Harrington testified that the receipts were turned over to the defendant, or to his brother George, or to messengers that either of them might send. The plaintiff's son George testified that, while it was not his habit to send on Monday evenings to Harrington for money to pay the men with, still he had done so, and had gone to Harrington himself for that purpose. The plaintiff testified that he had known the defendant to go up to the grocery store to get money to pay off the men. He says:

"I knew that they got money from the grocery store to pay off with. I never knew it was put in the bank account. I don't know what amounts were got to pay off with. I did not bother with the paying off, or anything about it."

Employés of the plaintiff also testified to the fact of getting money from the grocery store. Shortly after the transfer of these stores, the stock in one of them was seized by some of the creditors of Harrington. This resulted in a suit in which it would seem the defendant succeeded and recovered a verdict. It is shown that out of this recovery the defendant applied some $300 to a debt due from the plaintiff to his son-in-law, Mr. Bell. From these facts it is unquestionable that some of the proceeds of the grocery store were applied on the plaintiff's account. The learned referee does not find to the contrary, but was of opinion that, in the absence of proof that any specific sums were turned in to the plaintiff, no credits therefor should be allowed to the defendant. If the payments made for the grocery business are to be considered as being made for the defendant's personal benefit, it may be that this determination of the referee was correct, though even in this case we have the sworn statement of the defendant that he paid in to the plaintiff's business, from the grocery store, more than sufficient to cover all the checks drawn for the grocery business. It is true that, the defendant being an interested witness, his testimony, though uncontradicted, was not necessarily conclusive on the referee.

It may be conceded further that ordinarily his failing to keep any account or make any entry of the moneys which he claims to have paid in might well discredit his evidence. It is in this respect that it is material to consider the business methods of the plaintiff, in which the defendant had been trained, and a story which, if told by a clerk or a bookkeeper in an ordinary business, might seem of more than doubtful credit, would not be improbable when told by the defendant. Certainly he never had the advantage of this whole sum of $11,000. As found by the referee, in the whole five years during which he kept the bank account of the plaintiff's business, his property increased by less than $5,000. Though very probably the defendant exaggerates the economy with which he lived during this time, still it is plain that he lived simply, and had no expensive tastes or habits to gratify. The first of these checks was drawn immediately after the transfer of the grocery stores. From this, they were drawn every two or three days until the business was closed out. They seem to average about $50 a week, and all appear to be drawn to the defendant's order. There was therefore no concealment or fraudulent entry as to these checks, —a fact which tends largely to show the good faith of the defendant. But even though the burden is on the defendant to show affirmatively justification for the use of the plaintiff's moneys for the defendant's benefit, and though it may be considered that he has failed to establish specific repayments to the plaintiff of all sums drawn by him, I think this class of payments does not fall within the rule. In my opinion, the grocery store was not the independent venture or business of the defendant, but really that of the plaintiff. The plaintiff concedes he knew that the defendant had obtained the two stores, though he states he did not know it for some time after the transfer was made. The defendant testifies that he told the plaintiff of it, and that the plaintiff said to him that all he (plaintiff) wanted out of it was the amount of his claim against Harrington, and to get that as quick as he could; that the defendant might have the rest. The only consideration of the transfer of the stores was the debt to the plaintiff. The dealings of the parties, including not only those of the defendant, but of his brother George, already narrated, and of which the plaintiff had knowledge, show that the grocery business was considered as being carried on for the father's benefit. A payment, therefore, made in that business, was not a payment made for the defendant's personal benefit, but a payment on the father's account, and, unless shown to have been improperly made, presumptively the defendant was not chargeable with it. We think the defendant was therefore not liable for the amount of these checks. But he was not entitled to receive anything from the grocery store until his father's claim against Harrington had been satisfied in full. He claims it was so satisfied, but on this question the burden of proof was on him. He has not shown clearly that the plaintiff's claim was paid. The defendant should therefore be charged with the sum of $569, which he received when he sold out the remaining store. There is another class of checks with which the defendant has been charged. These checks are for small sums. They number 33, and amount in the aggregate to the sum of $1,347.87. The defendant

concedes that these were applied for his personal uses, but he contends that he took their amounts out of his weekly salary of $30, which he was entitled to draw. From the smallness of the amounts of these checks, which, as a rule, are within the weekly salary of the defendant, I am not prepared to say that his story is unreasonable; but, at the same time, I do not think we are justified in disturbing the finding of the referee as to them. As to the remaining classes of checks, with the amount of which the defendant has been charged, we have only to say that a careful examination of the evidence convinces us that the referee's findings as to them, despite the criticisms of appellant's counsel, were correct. This determination of the case has not been wholly satisfactory to us. We appreciate that it may well be that the plaintiff has suffered through the defendant even a greater loss than that allowed him by the original judgment which we have reduced. It also may be that the defendant has not been guilty of dishonestly appropriating any of his father's moneys, or is not liable for so large a sum as he had been charged with. Whatever uncertainty there is in the result at which we have arrived is occasioned by the character of the business methods of the parties. Those methods may not be the fault of either party, but at least they are their misfortune, and the result of that misfortune they will have to bear.

The judgment appealed from should be reversed, and a new trial granted before a new referee, costs to abide the event, unless plaintiff deducts from his recovery the sum of $10,803.45, in which case the judgment appealed from is further modified by excluding from the specific lien awarded to plaintiff the Lee avenue house and the Ridgewood house, which seem to have been acquired by the defendant prior to the transactions which are the subject of this litigation, and as modified it is affirmed, without costs to either party. All concur.