GEORGE W. BARNETT, Administrator of Estate of SARAH KEMP, Appellant, v. GEORGE W. KEMP.

Division Two, May 26, 1914.

1. ESTOPPEL: When Available. Estoppels are not favored, and are to be resorted to solely as a means to prevent injustice, "always as a shield, never as a sword." Where one's assertions or acts have operated to the injury of another, or where they were designed to or did influence another to his injury, he will be estopped to deny them. But the principle of equitable estoppel is that words or conduct to constitute estoppel must be wilfully spoken or done, or with the intention of deceiving the other party.

2. ————: ————: Admission of Indebtedness: Estopped to Deny: Bringing of Suit. A defendant is not estopped to deny his indebtedness and liability by admissions made prior to suit brought that he was indebted to plaintiff, when told that he must make a settlement of his dealings with his deceased mother, nor does such admission estop him from testifying when sued for a settlement and denying he is so indebted, nor does the bringing of a suit so change the position of the parties as to estop him from asserting his rights. Such admission is simply an admission, available for the purpose of testing his credibility as a witness, but not pertinent to estoppel.

3. ACCOUNTING: When Compellable. To compel an accounting a relationship must be shown to have existed between the parties from which a liability for money from one to the other necessarily arose. The basis of the action is the relation of principal and agent—in some one of the varied forms of business activity under which one acts for and on behalf of another in pursuance to such authority from such other.

4. ————: ————: Mother and Son. Where the son did not rent the farm or town property of his aged mother, or collect the rents, or repair the fences or houses, or sell the crops, except under her direction and with her approval, and kept no books, and, although she lived with him in his home as a member of his family for more than twenty years and he looked after the farm and her houses and the selling of the crops for her, she was mentally alert and disposed to direct her own affairs, and there is nothing to indicate that she ever considered him indebted to her or complained of his conduct or expected him to account to her in any way, he

cannot be compelled by her administrator, after her death, to account for her moneys, if any, that came into his hands. She had a right to give him her entire income and more if she chose in exchange for a home and the companionship of his family, and unless there is some showing that she considered him indebted to her he cannot be held to be liable to her administrator, there being no allegation of fraud, unfair dealing or undue influence.

Appeal from Pettis Circuit Court.—*Hon. Louis Hoffman*, Judge.

AFFIRMED.

*George Barnett, Jr., Sangree & Bohling* and *Barclay, Fauntleroy, Cullen & Orthwein* for appellant.

(1) In an action for an accounting, the principal has the burden of showing the amount received and not accounted for, but it is not necessary for the principal to prove that the agent has not accounted for money he is shown to have received. The burden is upon the agent to show that he has accounted. Young v. Powell, 87 Mo. 128; Carter v. Primm, 52 Mo. App. 102; Bunker v. Hibler, 49 Mo. App. 542; Anderson v. Bank, 4 N. D. 182; Marvin v. Brooks, 94 N. Y. 71; Bank v. Rawls, 7 Ga. 191, 50 Am. Dec. 394. (2) An agent who fails to keep an account raises thereby a suspicion of infidelity or neglect, creates a presumption against himself, and brings upon himself the burden of accounting to the utmost for all that has come into his hands; and in such a case every doubt will be resolved against the agent, and in favor of the principal. Linen Co. v. Hough, 91 Ill. 63; Peterson v. Poigard, 8 B. Mon. 309; Traction Co. v. Anson, 41 Ore. 562; Landis v. Scott, 32 Pa. St. 495; Stainton v. Carron Co., 24 Beav. 346, 3 Jur. N. S. 1235, 27 L. J. Ch. 89, 53 Eng. Reprint 391. (3) Where a party, before suit, gives a reason for his conduct and decision touching anything in controversy, he cannot, after litigation begun, and costs made, change his ground and

put his conduct upon another and different considera-
tion. He is not permitted to thus mend his hold. He
is estopped from doing it by a settled principle of law.
Railway Co. v. McCarthy, 96 U. S. 258; Danville v.
Insurance Co., 71 N. W. (Mich.) 517; Insurance Co.
v. Waugh, 83 N. W. (Neb.) 81; Ballon v. Sherwood,
49 N. W. 796, 797.

*Montgomery & Montgomery* and *Charles E. Yea-
ter* for respondent.

(1) Plaintiff is not entitled to plead estoppel
against the defendant on the ground that he brought
the suit on the faith of his admissions of indebtedness,
because thereby no change was effected in the rights
or remedy of plaintiff, which remained precisely the
same as before suit, and costs of suit are not a suffi-
cient basis for estoppel; (2) and a party can not claim
estoppel because of representations which induce him
to do some act he is already legally bound to do; (3)
moreover, the representation of indebtedness made by
defendant was made on the confidence that defendant
had in plaintiff as his attorney and intimate friend
of many years' standing, and the probate judge, both
of whom told him he owed his mother's estate and
must account for the rentals; (4) and such represen-
tation was merely a legal conclusion or a mixed con-
clusion of law and fact now at bar in this case. Lum-
ber Co. v. Lumber Co., 117 La. 1; Hughes v. Life Ins.
Co., 32 Wash. 1; Jamison v. Auxier, 124 N. W. (Ia.) 606;
Eikenberry v. Edwards, 67 Iowa, 67; Frei v. McMurdo,
101 Wis. 423; Glove Co. v. Jennings, 58 Conn. 74; Bank
v. Falkner, 31 N. J. L. 52; Lewis v. Prenatt, 24 Ind.
98; Warder v. Baker, 54 Wis. 49; Land Assn. v. Banks,
80 Minn. 317; McMaster v. Ins. Co., 55 N. Y. 222;
State ex rel. v. Lumber Co., 77 Mo. App. 545; 16 Cyc.
751, 765. (2) Mrs. Kemp and defendant were never
in the relation of principal and agent, or beneficiary

and trustee, but there was simply the relation of mother and son, living together in the same family and using common funds, the son assisting his aged mother as best he could, but subject to her control and domination, and keeping no books with her consent, but reporting all transactions to her at the time, which relation continued to the satisfaction of both parties until the mother's death; consequently the defendant accounted to his mother in her life time and plaintiff is not entitled to an accounting from him. Carrau v. Chapotel, 47 La. Ann. 408; Evans v. Evans, 42 Tenn. (2 Cold.) 143; Title & Trust Co. v. Weitzel, 152 Pa. St. 498; McCarty v. McCarty's Admr., 11 Ky. L. R. 366; Donavan v. Griffith, 215 Mo. 149. (3) While it is a general rule that it is the duty of an agent to keep true and regular accounts and render statements thereof when required by the principal, such general rule has no application to a case in which all matters of account were fully explained at the time as the business proceeded, and where by the consent of the principal no books are kept. Carrau v. Chapotel, 47 La. Ann. 408; Rich v. Austin, 40 Vt. 416; Macauley v. Elrod, 16 Ky. L. R. 549; Hamilton v. Hamilton, 44 N. Y. Supp. 97; Robbins v. Robbins, 3 Atl. (N. J.) 264· Smith, Admr., v. Perry, 197 Mo. 460.

WALKER, J.—This is a suit in equity for an accounting brought in the circuit court of Pettis county by the administrator of the estate of Sarah Kemp, deceased, against George W. Kemp, her son. On a hearing a judgment was rendered in favor of the defendant, from which the plaintiff appeals.

Plaintiff in his petition, after the formal allegations as to his appointment, qualification, taking charge of the estate of Sarah Kemp, and

**Pleading.** that he is now acting as administrator of same, alleges that prior to the year 1887 one James Kemp died in Pettis county, leaving a large amount

of property; that at the time of the final settlement of said estate defendant was administrator of same, and in said year as such administrator made a final settlement of said estate, and in same there was found to be due Sarah Kemp, the widow and sole legatee of deceased, the sum of $6667.42; that at the time said Sarah Kemp was infirm from age, and remained so until her death, which occurred in the early part of 1908; that during this time she lived with her son, the defendant, as a member of his family, and constituted him her agent to conduct and manage all of her business; that by reason of the confidence reposed by her in the defendant, a fiduciary relation was created between them, and that defendant managed and controlled her property, received the proceeds thereof, and paid out whatever was necessary for her support, and made the expenditures necessary in the conduct of her business.

That upon the final settlement of said estate by defendant as such administrator, there was turned over to him as agent for his mother, the sum of $6667.42, to be held and managed by him for her use and benefit.

That Sarah Kemp owned a large farm of six hundred and twenty-nine acres in Pettis county, and that defendant as her agent controlled same, and received the rents therefor; that the rental value of same was about $900 per year, and that defendant received an average of this sum per year for a period of twenty years consecutively, beginning with the year 1887 and ending with the year 1907, making a total of $18,000 thus received by defendant.

That for a period of sixteen years prior to her death Sarah Kemp owned, in the town of Lamonte, a house, livery barn and a lot of ground, of the rental value of $8 per month, or $96 per year, and that defendant has received for her the rents on said property for said period in the total sum of $1536.

That the aggregate sum received by defendant for and on behalf of his mother, during the time he acted as her agent, was $25,203.42, as near as plaintiff can ascertain same.

That said Sarah Kemp was old and required but little for her support and maintenance, the necessary amount of which plaintiff has not been able to ascertain, a matter peculiarly within the knowledge of the defendant.

That plaintiff has demanded of defendant a statement of his accounts showing the total amount of money received by him for his said mother and the amounts paid out on her account, and the items thereof, but that the defendant has failed and refused to render said account to plaintiff or to pay anything on account thereof. Wherefore the plaintiff prays for an accounting between plaintiff and defendant, and for judgment, etc.

Defendant for his answer admits the death of James Kemp, prior to 1887; that he left a will, and a large amount of property; that at the time of the final settlement of the estate this defendant was the administrator and made such settlement, but denies that there was then found to be due Sarah Kemp the sum of $6667.42, or any other sum, and denies that on said settlement said sum was paid over to him. He admits that his mother was old in 1887, she having been born in 1813, but denies that she was feeble or remained so until her death in 1908, but on the contrary that she was a woman of strength and activity, in full possession of her mental faculties until her last illness. That his mother lived with him, as a member of his family, from 1892 until her death, but denies that she constituted him her agent to conduct and manage her business, or gave him sole control thereof. But he admits that she reposed entire confidence in him and that their relations were confidential; but he denies that any agency, trusteeship or other fiduciary rela-

tion other than that arising from their kinship as mother and son, and the affection and confidence they had for each other, existed between them; that he did manage and control her property and received the proceeds thereof, and paid the necessary expenses thereon, and that the true facts of the relations between defendant and his mother are as follows:

That in 1882 said James Kemp, the husband of Sarah Kemp, died, and she was left alone on the farm, and the defendant as her son from a sense of duty and affection undertook the management of her affairs; that she had only one other child, a Mrs. Hendrix, whose husband was then living, and that Mrs. Hendrix would not or could not live with her mother, and that the defendant felt in duty bound to assist his mother in running the farm and managing her property; that she remained on the farm until 1889 or 1890; that defendant then sold his own farm and moved into the town of Lamonte, and finding it inconvenient to go to her home as often as he was required to do in his care for her, it was agreed that she would move into town and live with him. That with money furnished him by his mother he managed the farm, paid the taxes, made the repairs and other expenses, with the income derived therefrom, and that he did this purely as a gratuitous agent under the direction and supervision of his mother. That although she was old and occasionally ill, she retained her mental faculties unimpaired, and was at all times competent to manage and direct her business affairs. That whatever defendant did in the renting of the farm or in the use, investment or expenditure of money belonging to his mother was done with her knowledge and under her direction. That no books of account were ever kept between them, and all matters were settled at the time they occurred. That all moneys handled, received or expended were in accordance with his mother's as-

sent and wishes, with no expectation or intention of holding the defendant liable to her or anyone else therefor.

That they lived as mother and son, and as one family, from the time she began to live with him, until her death. That he received and used her money as common property for common use, under her direction, and as she deemed proper, and that no cause of action exists in plaintiff to recover same or any part thereof. Defendant admits the ownership of a farm by his mother, but avers that there was only about three hundred and twenty acres of tillable land thereon, the greater part of the tract being timber, unfenced and not cultivated, and from which no income was derived. He denies that the rental value of said land was $900, or that he or his mother received an average of $900 a year therefor. He admits that she owned a dwelling house and livery barn in the town of Lamonte, and avers that he bought it under her direction with the sum of $1600 she gave him; that through error the title was taken in his name, but he has disclaimed title thereto adverse to his mother; that he denies the rental value of said property was $1536, or that he or his mother ever received any such sum therefor.

He denies that during the years alleged by plaintiff, he received as agent or otherwise, for his mother, cash and rents amounting to $25,203.42, and that whatever amount of money he received was in the manner and under the circumstances and agreements heretofore stated; he admits that his mother was old but denies that she required little for her support; that he paid out for necessary expenses and repairs on her property the sum of $150 a year, during the period aforesaid, and paid taxes thereon during the same period, averaging $125 a year; that he built a barn and made other improvements under his mother's direction, in addition to the repairs mentioned, at a cost of $300. That the care, support and maintenance of

his mother during the period of time referred to by plaintiff was $600 a year, and that he paid for medical attention and medicine during said period a large amount which he is not able at this time to definitely state. That if required to account for said rents and moneys alleged by plaintiff to have been received by defendant, he is entitled to have credits for all of said expenditures, and he prays the court to protect him in this behalf and for other proper relief.

Plaintiff for his reply denies specifically each of the allegations made in defendant's answer, and avers that defendant applied for letters of administration on his mother's estate, and that the probate court refused to appoint him on the ground that he was indebted to said estate, but appointed the plaintiff instead with a view of collecting from defendant the rents due the estate so collected by him; that plaintiff has called upon defendant for a statement of rents and other matters of his indebtedness to the estate of Sarah Kemp, and that defendant admitted he had been collecting rents for a great many years, and that he was indebted to the estate for rent so collected, but stated that he had kept no books of account, and did not know the amount of his indebtedness, but knew that it was a large sum, and that he had no money with which to pay it, and no means of paying it, and did not know how he could ascertain the amount of the indebtedness; that plaintiff asked defendant to prepare a statement of account, and that defendant agreed to do so with a view to attempting to arrive at the real amount due; that defendant deferred making such statement from time to time, and never did furnish same; that in none of the conversations had by the plaintiff with the defendant did the latter deny his liability to the estate or that he had acted as his mother's agent in collecting rent, but admitted at all times, that he was the agent of his mother in the collection of rents, and that he owed her estate for same;

that defendant did not claim at any time that he had used the money belonging to his mother, with her knowledge or acquiescence, and did not claim that the accounts between them were settled at the time they occurred, and that he had only used the money in accordance with her wishes, and made no claim that he had collected her money and used it without any expectation on her part of its being repaid, and that at no time did he claim that there was an understanding between them that the money should be used as their common property without his accounting for same, or that the same was expended and consumed as the said Sarah Kemp saw proper, with her full knowledge and consent; that plaintiff had no information of any such contentions until served with a copy of defendant's answer.

That in bringing this suit plaintiff relied upon the statements of the defendant that he had collected the rents for a long period of years, and that he owed his mother's estate for same, less the reasonable expenses incurred in keeping said farm in repair, in paying the taxes and for the support of his mother, and that no defense was claimed by defendant prior to this suit other than said deductions from money collected by him for purposes aforesaid, and in bringing this suit plaintiff relied upon the statements of defendant that he owed his mother for rents collected as aforesaid.

Plaintiff says he brought this suit because of defendant's delay in furnishing him with a statement of his account and of defendant's inability to arrive at the amount due otherwise than by suit; that defendant is estopped and precluded from now making the defense that he is not liable for this rent, and from pleading the defense set forth in his answer, and it would be inequitable and unjust to permit him now to assert same.

Sarah Kemp, the administrator of whose estate instituted this action, inherited at the age of **The Facts.** seventy-five years, as relict and sole legatee of her third husband, James Kemp, a tract of land and other property near Lamonte in Pettis county.

By her first marriage, Mrs. Kemp had one child, a daughter, referred to herein as Mrs. Hendrix; by her second marriage she had a son, George W. Kemp, the defendant; by her third marriage to James Kemp, of the same family name as her second husband, she left no bodily heirs surviving her. This will suffice to render intelligible necessary subsequent references to these parties.

Sarah Kemp died at the age of ninety-five years, at the residence of George W. Kemp, the defendant, at the town of Lamonte, in April, 1908. A few days thereafter the son went to Sedalia, the county seat, for the purpose of administering on his mother's estate. Preparatory thereto he consulted a lawyer, Mr. Geo. W. Barnett, who had represented him as counsel in litigated cases, and had been his legal adviser in other business matters for many years. They went to the office of the probate judge, who informed them that objections had been made to the appointment of defendant as administrator, and no further steps were taken at this time. A short time thereafter Mr. John D. Bohling, a lawyer of Sedalia, representing Mrs. Hendrix, the sister of the defendant, called at the office of Mr. Barnett and informed him that as counsel for Mrs. Hendrix he would object to the appointment of defendant as administrator because the latter was indebted to the estate on various accounts. When, therefore, defendant next came to Sedalia, Mr. Barnett again accompanied him to the probate judge's office for the purpose of commencing the administration. Mr. Bohling appeared as attorney for Mrs. Hendrix and objected to defendant's appointment on

the ground before stated by him. The court thereupon announced that defendant would not be appointed, but that he would appoint Mr. Barnett as such administrator. The latter accepted and at once qualified.

It is not inappropriate in an equitable proceeding where all the facts are reviewed by the appellate court, that testimony explanatory of the circumstances under which the suit was brought should be somewhat minutely stated. This is best done in the language of Mr. Barnett, who, on the witness stand, testified as follows: "It was not stated that I was appointed administrator for the mere purpose of suing Mr. Kemp, but they wanted somebody who could get this rent by an amicable suit, if necessary. I was notified by you gentlemen—I refer to you gentlemen representing the Hendrix side of the controversy—that I must proceed to collect what Mr. Kemp owed. I at once started to work to try to get it settled at that time. I was not contemplating a suit right away. I asked Mr. Kemp to come over to my office to go over that matter and he did. Mr. Kemp is hard of hearing, and I talked loud to him. I had been his attorney in past years— not in many suits, but he had a suit with Mr. Fleming, and Yeater was on the other side, but I had never been his attorney in these matters here that involved his relations with his mother's estate, so far as collecting the rent, and if I had ever known there was such a question I had forgotten it and did not know it until you gentlemen called my attention to it. I said to Mr. Kemp, 'Now, I am not your attorney now; I have not rendered you any services; I went over there to render you some, but the court took an action that severed my relations as attorney, and there is no charge for what I have done, and I want to say now that whatever you say to me is not as your attorney. You will have to hire an attorney, that is, if you want an attorney, you will have to hire one, but I am against you instead of for you.'" After this admonition Mr. Barnett

proceeded to examine his former client and to elicit from him the information which constitutes the principal evidence for the plaintiff. It is in effect as follows: "I said, 'Mr. Kemp what do you owe the estate, if you owe it?' He said he owed a large amount; more than he would be able to pay unless it came out of the land; that he owed for twenty years' rent while acting for his mother; that he represented her in attending to her business, and as her agent he collected the rents for all those years and he owed for it. I asked him to give me a statement of the rents, and he said he could not, he hadn't kept any books, and we talked about the complications that arose therefrom, and Mr. Kemp said there would be some taxes he had paid out, that he had paid the taxes; and had done something, I don't remember what, about keeping the place in repair, and he supposed he ought to be allowed something for his mother living with him. I said, 'That will have to be determined, but what I am requesting you to do is to make out an itemized account; if you haven't any books use your memory, but where your memory don't serve you, take a kind of average of the rental of the place—you know pretty well what you rented it for. Make out an itemized statement of any other money you received and take credit for whatever you think you ought to have for paying taxes and keeping it in repair, render me that statement and I will notify the Hendrixes and possibly we can agree upon a settlement, and have it made some kind of a charge on your part of the real estate.' He promised to do that. He said he could not do that by himself and wanted an attorney to help him, and I took him over to the Montgomerys, and introduced him, and I think I stated the substance of what had been said. Afterwards the matter ran on, and I wrote Mr. Kemp several letters, and went to Lamonte, and after some talk about grain in the elevator, corn in the bins and rent on the barn, I asked him to act for me as my agent

and he did. And when I went up there again, I called his attention to the statement he had agreed to make. The Hendrixes complained I was not moving fast enough. The matter kept going on, and they said there had been enough delay and I brought suit. He didn't in that conversation intimate that he had collected the rents for the joint use of himself and mother and ought not under the circumstances to account for it, but he said he was liable for the rent and would account for it after finding out what it was and making proper deduction for his trouble. I never heard there was any other theory until a copy of this answer was served on me. Mr. Kemp never made any statement as to how much he received a year from the place, and if I have ever seen the farm I don't recollect it.''

On cross-examination Mr. Barnett stated that ''he first got acquainted with Mr. Kemp when he was employed by the latter to represent him in a cause which was in litigation for a number of years. From that time on he was intimately acquainted with him; that he had advised him about other matters; that his relations with Mr. Kemp embraced a period of a great many years; that he was, during this time, an intimate friend of Kemp, and continued so; that he had read an account of the death of Sarah Kemp, the mother of the defendant, whom he had met at the latter's home, and really expected the latter to come down''— evidently to confer with him concerning an administration of the estate.

George W. Kemp's testimony as to his statements made to Mr. Barnett are substantially as follows: ''After he [Barnett] was appointed administrator he and the judge told me I would have to render an account, make a statement of the rents, of the rents I had collected, the money I had paid out and things of that kind, and I told him I hadn't kept any books and I didn't know how I could make it. Mr. Barnett afterwards told me—I don't recollect

whether he told me that day or not—yes, it was that day—that he was then not my attorney any more; he had been my attorney, but that he wasn't my attorney, and I would have to get someone else. He had been my attorney, I had confidence in him and I told him, I said, 'Mr. Barnett, I am not very well acquainted with lawyers in Sedalia,'. and for him to suggest some good lawyers to confer with. He referred me to Montgomery & Montgomery, and said Mr. Yeater would be a good man. I think that is about what he told me and what the judge told me, if I remember everything correctly. He told me it was my duty to make a settlement, that under the circumstances I would have to make a settlement; that Mrs. Hendrix was claiming I was owing them a right smart of money. I supposed I would have to make a settlement because they told me so. I hadn't considered that I would have to before that because mother had always said that that had nothing to—'' Here the witness's testimony was objected to by Mr. Barnett in this language: ''We object to him testifying in this cause at all except as to conversations had with others since her death.'' The objection was by the court sustained, and there was no further examination of the witness.

The testimony of Mrs. Hendrix (sister of defendant) relative to what the latter said as to his administration of the estate of James Kemp and his management of his mother's business, is appropriate in this connection. It is in substance as follows: ''I had been down town and I stopped at his store and told him I would like to have a little talk with him. I asked him what became of the money he had on hand when he settled up the estate of James Kemp. He said it was all on record down here. He never told me anything, only what I asked him. He never told me much about it one way or the other. I told him I knew he wasn't very stout and I wasn't able to do anything myself, and I thought he was coming down

to see about the administrator [of Mrs. Kemp's estate], and I said, 'George, I would rather you wouldn't administer, you have got all you can do to attend to your own business and you are not able to attend to this affair, and I ain't either, and I would rather get someone else to do that.' That was after mother died. I had the first conversation with him before mother died, and the next at his store afterwards. We didn't say very much. I asked him about this money on hand when he settled up the estate of James Kemp and he said it was all on record down here at the court house, and that is pretty near all that passed. I asked him if mother loaned him that money or did he borrow it, and he said no, that Ma simply turned it over to him to the best of her advantage. That is pretty near all that was said as near as I recollect. He never told me much about it one way or the other, and I didn't meddle with it. I thought he would do what was right and in mother's lifetime I never wanted to bother her in any way and I never said much about it. I did ask him one time who the place was rented to, and that is about all. He didn't say anything only told me the names of the parties. He didn't tell me what he got for the place, or nothing, or how he rented it."

The substance of the relevant testimony of James C. Hendrix, son of Mrs. Hendrix and a nephew of the defendant, is to the effect that the defendant admitted to him that he owed the estate a big lot of money and that that was about all the conversation that witness had with the defendant.

The testimony of Mrs. Minnie Andrews, a granddaughter of Mrs. Hendrix, was as follows: "I was present when the conversation occurred between Mrs. Hendrix and Mr. Kemp. We had been up town and came by the store, and grandma said to Uncle George she wanted to have a talk with him about the estate, that she had never known how things were

run and would like to get an insight as to how the business was attended to; she asked him if he had borrowed this money from grandma and he said no, that grandma had simply turned it over to him to be used to the best of her advantage, and she asked him if all the corn had been sold on the place, and he said yes, and also said by selling the corn at the price it was sold it had beat him out of $20. She said there was only the two children and they could get together and agree on this business without trouble, and he said he thought so, too. She asked him about the money on hand when the estate was settled, and he said there had been a record given of every cent of the money. Then she asked him some questions he didn't answer, and she asked him about how much property there was in Lamonte, how much property grandma had, and he said she owned a house and lot in Lamonte, but he didn't tell her about the livery stable until she asked. This was practically the sum and substance of the conversation. He voluntarily said the house and lot belonged to his mother. Then she asked him if grandma didn't own a livery stable in Lamonte, and he said yes. Nothing was said about the cost of the property.''

In connection with this testimony the fact is pertinent that the final settlement of the defendant as administrator of the estate of James Kemp introduced in evidence discloses no indebtedness on the part of the defendant to said estate.

The witnesses whose testimony is above set forth, were all, except the defendant, introduced by the plaintiff. The nature of the business relation sustained by the defendant towards his mother must be deduced from this testimony, as that of other witnesses, except as to fragmentary facts and circumstances, is silent in regard thereto. The general facts are that the stepfather, James Kemp, whose estate is the core of this controversy, died in 1882, and his wife, Sarah Kemp, remained on the farm and continued to conduct same

with the aid of the defendant who resided and was
engaged in business in Lamonte. The difficulties at-
tending this manner of conducting her business were
such that the mother, after consultation with her son,
finally concluded to move to Lamonte and become a
member of his family. This she did in about 1890, and
for eighteen years thereafter or until her death in
1908, they resided together in that amity which should
characterize this kinship. Mrs. Kemp was a woman
of strong and clear mind, and of a rather dominating
nature. Her son, the defendant, was weak physically
and of rather vacillating disposition, and hampered in
his social and business intercourse by deafness, and
there are many facts, affirmative and circumstantial,
indicating that he was not only guided in the general
conduct of his mother's affairs by her, but that in par-
ticular matters, such as the renting of the ground and
collection of rents and the sale of the products of the
farm, he did nothing without consulting her. Whether
in any of these matters he accounted to her or was
required to account to her, there is no evidence; but
considering their respective natures and dispositions,
the conclusion is almost inevitable that whatever he
did was under her direction. So far as is shown by
the testimony, there is nothing to indicate that there
was any change in the nature of this relationship or
that her mental alertness and disposition to direct her
own affairs was in any way impaired until a short
time before her death. It is true that for at least two
years before her death her physical condition, due to
rheumatism and a rectal paralysis incident probably
to old age, rendered her unable to do more than assist
as her inclination prompted in the house work; this
disability, however, does not appear to have lessened
her mental capacity to manage her own business.
Aside from the administrator's testimony as to the
statements made to him by the defendant, and that
of Mrs. Hendrix and her son and granddaughter,

there is not a vestige of testimony to show that Mrs.
Kemp ever regarded her son as her agent in a business
sense or demanded or expected an accounting from him
of the money expended under her direction. It is a
reasonable presumption, however, that he accounted
to her from time to time as the business was trans-
acted. Of this he was not permitted to testify. The
court's ruling in excluding his testimony is not open
to criticism.

Much of the voluminous record in this case has
been taken up with the testimony of witnesses as to
the renting of the farm, the income from such rental
in cash or from crops raised thereon, and the expendi-
tures made by defendant in connection with the prop-
erty. Under the view we have taken of this case, the
introduction and preservation in the record of this
testimony was unnecessary; it was probably introduced
upon the theory if the trial court required an account-
ing of the defendant that the duty devolved on him
of showing the manner in which he had conducted his
mother's business.

I. It is contended by the plaintiff that the alleged
admissions of the defendant in regard to his
indebtedness to the estate are binding,
**Estoppel.** and that he is estopped from denying
same, notwithstanding the circumstances under which
the admissions were made. While it is true as a gen-
eral proposition that where a party gives a reason for
his conduct touching a matter in controversy he can-
not afterwards change his base and put his conduct
upon another and a different ground, or, as Justice
SWAYNE puts it in Railway Co. v. McCarthy, 96 U. S.
l. c. 267, "he is not permitted thus to mend his hold."
This language, while general, must be construed in
the light of the principles governing equitable estop-
pels which are that an assertion or act to constitute
an estoppel must be wilfully made or done with the

intention to deceive the other party. Where it appears, therefore, that one's assertions or acts have operated to the injury of another, or where one's expressions and course of conduct were designed to or did influence another to his injury, their denial will be estopped. Further it is held that estoppels are not favored and are to be resorted to solely as a means to prevent injustice, "always as a shield, never as a sword." [Pierrepont v. Barnard, 5 Barb. (N. Y.) 364; Royce v. Watrous, 73 N. Y. 597; Campbell v. Nichols, 33 N. J. L. 81; Colter v. Calloway, 68 Ind. 1. c. 222; 2 Herm. Estop., sec. 787, p. 714.] Our own court, guided by these well established principles, has declared that the facts relied on to establish an equitable estoppel must be such as to have caused the party asserting them to have changed his position in reliance thereon to his injury. [Thompson v. Lindsay, 242 Mo. 53; Withers v. Railroad, 226 Mo. 373; Freeland v. Williamson, 220 Mo. 217.]

The facts in the case at bar do not lend favorable color to the contention of plaintiff that defendant is estopped from denying liability by reason of the alleged admissions made by him to his former counsel. In marked contrast with the dominant characteristics of his mother, defendant was of a weak and vacillating nature, and was further handicapped by a defective sense of hearing. When told, therefore, as he says he was, by his former counsel and confidential adviser, and the probate judge, that he must make a settlement, moved by that confidence which clients often repose in counsel, he no doubt went to the counsel's office, and, as the latter testifies, frankly answered the questions propounded to him. But in what manner does this constitute an estoppel and close his mouth when testifying at the trial, when he had become aware of his rights and had a full knowledge of the purpose of the inquiry? His former admissions in no manner changed the rights or lessened the remedy of plaintiff; if plaintiff deemed

that a cause of action existed, it was his duty, regardless of any statements or admissions made by the defendant, to institute the action. The most · that can be said of the alleged admissions—and this is not pertinent to the question of estoppel—is that they are properly available in determining the witness's credibility, and we have so considered them.

As to whether or not the bringing of the suit by plaintiff changed his position within the meaning of the law of estoppel, the Supreme Court of Louisiana, in Des Allemands L. Co. v. Morgan City T. Co., 117 La. 1, says: ''The bringing of a suit is not a change of position within the meaning of the law of estoppel. The suit cannot create rights, nor change the legal situation. It can only enforce the existing rights, such as they happen to be. A litigant cannot create an estoppel against his adversary by merely filing a suit against him.'' And on the same question the Supreme Court of Iowa in Jamison v. Auxier, 145 Iowa, 654, says: ''Defendants have done or omitted nothing which caused plaintiff to change his position, or to go to any expense which he would not otherwise have incurred, save, perhaps, to bring suit on the note. The bringing of suit is not a fact, however, upon which to predicate a plea of estoppel.''

And the Supreme Court of Minnesota, in Western Land Assn. v. Banks, 80 Minn. 317, says: ''The doctrine of estoppel has no application in cases where the representations. which are claimed to give rise to it tend only to induce a party to do some act he is already legally bound to do.''

In the absence, therefore, of any of the elements necessary to constitute an estoppel, we must hold that it is not properly invoked. in this cause.

II.  To sustain an action for an accounting, some such business relation must be shown to have existed

Accounting.    between the parties as to create a liability on the part of the one to the other. More briefly, the basis of the action must be the existence of the relation of principal or agent, in some one of the varied forms of business activity under which one, being authorized, acts for and on behalf of another. In fact, no form of human action save by the actor himself, is possible without the creation, although it may be for the one act alone, of the relation of principal and agent. It was created and existed between defendant and his mother; so well defined was the relation that he did not rent an acre of ground, reset a fence, sell a crib of corn, or a stack of hay, except under her direction and with her approval. That he received and paid out money for her in conducting her business, we do not doubt, although there is a paucity of testimony in this regard. In the absence of an express appointment or acceptance, much may, of course, be inferred as to the nature of a business relationship from the words and conduct of the parties and the correlative circumstances connected with the case. We have weighed all of these in an effort to determine whether the relation which existed between these parties was such as to create a liability on the part of the defendant. The fact that the relation of principal and agent may in form have existed in this case, lends no force to plaintiff's claim unless it be shown that a liability was thereby created on the part of defendant.

The property, real and personal, belonged to the mother; her mental alertness and the exercise of her authority in regard to it, shown by the testimony, we have adverted to. The mother being dead, the son's mouth is closed as to the nature of his relations with her, and the evidence in regard thereto, in the absence of other witnesses, must be gleaned from her conduct, so far as it can be shown by all the facts and circumstances in the case. While he acted for her and she kept a watchful eye upon his actions, she required him

to keep no books and if he accounted to her it must have been orally after each transaction. If he was required to make settlements, the conclusion is almost inevitable that they were made after the same manner as his reports. No syllable of testimony indicates that she was at any time dissatisfied with this manner of proceeding, and it is almost proof positive that if dissatisfaction existed the ever open ears of the village gossip would have heard it from her at some time during the twenty years and more that the relation existed. Under this state of facts, in the utter absence of evidence to sustain it, we are asked by the plaintiff to require the defendant to do what was never required of him by his mother, viz.: render an account of his transactions.

Living, Mrs. Sarah Kemp may have been unbusinesslike in her methods, but her power to do with her own as she chose cannot be questioned. If she chose to give her income or more to her son in exchange for a home and the companionship of those endeared to her by association and ties of blood, a court of conscience, whose decrees should be tempered by sentiment as well as a wholesome sense of right, should not interfere with her choice. Especially is this true where as in this case there is no allegation of fraud, unfair dealing, or undue influence, and no intimation that she was not, at all times, of sound mind. The plaintiff's petition is to be commended in this respect as, after the necessary formal allegations, it plants its plea for a decree upon defendant's mismanagement of the estate. In our opinion, the facts and circumstances do not justify equitable intervention. Precedents in support of the conclusion reached here in regard to an accounting may be found in the following cases: Donovan v. Griffith, 215 Mo. 149; Smith, Admr., v. Perry, 197 Mo. l. c. 461; Crowley v. Crowley, 167 Mo. App. 414; Carrau v. Chapotel, 47 La. Ann. 408; Evans v.

Evans, 42 Tenn. (2 Cold.) 143; Fidelity T. & T. Co. v. Weitzel, 152 Pa. St. 498; McCarty v. McCarty's Admr., 11 Ky. L. R. 366; Rich v. Austin, 40 Vt. 416; Macauley v. Elrod, 16 Ky. L. R. 549; Hamilton v. Hamilton, 44 N. Y. Supp. 97, 102; Robbins v. Robbins, 3 Atl. (N. J.) 264.

The industry and learning of counsel have prompted them to submit, pro and con, other matters for our consideration than those we have discussed, but as the burden of plaintiff's plea is for an accounting, and we have denied his right to same, the consideration of other matters is unnecessary.

From the foregoing it follows that the judgment of the trial court should be affirmed, and it is so ordered. *Brown* and *Faris, JJ.,* concur.