## UNITED STATES v. PETTYJOHN et al.
### (two cases).
### Nos. 5575, 5576.

United States District Court
W. D. Missouri, W. D.
Oct. 1, 1950.

See also 84 F.Supp. 423.

Kemp, Koontz, Clagett & Norquist, Kansas City, Mo., for Bess Pettyjohn.

Jerome Walsh and David Skeer, Kansas City, Mo., for Harry A. and Helen Pettyjohn.

Omar E. Robinson and Seth S. Lacy, Kansas City, Mo., for Francis L. Pettyjohn.

REEVES, Chief Judge.

The issues in this case have been greatly narrowed and simplified by a decree heretofore entered by agreement of the parties. Such decree was dated and filed September 28, 1950. By this decree many important and otherwise controversial facts were agreed upon and stipulated in the decree.

By those stipulations of the parties the sole and only questions to be resolved and determined by the court are the rights of the parties in and to the parcels of real estate mentioned in the decree. It was acknowledged by the parties, in submitting the proposed decree, that the decedent, Harry L. Pettyjohn, died intestate on May 26, 1946, and, that, at that time and a long time prior thereto he was the sole and exclusive owner of all property used and useful in the operation of a business founded by him and known as Centropolis Transfer Company. In truth and in fact the Centropolis Transfer Company was the name under which Harry L. Pettyjohn, the decedent, carried on his business. Such business is now located at 7012 Truman Road, Kansas City, Missouri.

A certain transfer and an arrangement between Harry A. Pettyjohn and Bess Pettyjohn, as administratrix of the estate of Harry L. Pettyjohn, deceased, which constituted a controversial matter, has been adjusted and settled by the decree. The only question remaining upon this extensive record is for the court to determine what rights, if any, Harry A. Pettyjohn and his wife, Helen Pettyjohn, have in certain properties acquired during the life of Harry L. Pettyjohn and thereafter following his death, and paid for out of moneys taken out of the business of the Centropolis Transfer Company.

In this connection it should be stated that the operation of the Centropolis Transfer Company has continued without interruption following the death of Harry L. Pettyjohn. Its continuing operation was never authorized by the Probate Court of Jackson County, Missouri, having jurisdiction over the administration of the estate. This was due to the fact that the administratrix was not aware of her rights and duties in relation to it.

It appeared from undisputed evidence that Harry L. Pettyjohn was stricken or became seriously ill on December 4, 1942. Prior to that time he had carried on his business as Centropolis Transfer Company as sole executive, and Harry A. Pettyjohn (his son) worked as an employee of and as an aid to him. Prior to the time he was stricken Harry L. Pettyjohn had not only been the sole executive in the management of his business but had regularly made and executed his Income Tax Returns. Following such illness he never again signed an Income Tax Return, nor did he participate in the making up of such return so far as this record shows. With a single exception, tax returns were signed in his behalf by his son, Harry A. Pettyjohn. The return for one year was signed by his secretary or an employee in his place of business. According to the overwhelming preponderance of the evidence the decedent, after being stricken on December 4, 1942, never again was physically or mentally able to carry on his business and to continue as executive in the management of the business established by him, although he did some business, signed a few checks, and conferred with a limited number of customers in respect of contracts for Centropolis Transfer Company. The active, and practically the exclusive management and executive duties of the business were assumed or taken over by Harry A. Pettyjohn (for whom it incidentally may be said that he demonstrated both capacity and executive ability). The business prospered under the latter's management. It was his practice to take out of the funds of the business an allowance for his father in the amount of $100 per week for living expenses and also to provide funds, such as might have been needed on pleasure or vacation trips, or specially upon a trip in March, 1943, to Rochester, Minnesota, for medical examination and treatment.

During the period of the decedent's illness and until his death, on May 26, 1946,

he relied upon his son to carry on his business, and the relation of trust and confidence was established and maintained between them until the father's death. On more than one occasion decedent expressed his deep appreciation for the services of his son and his capacity to carry on the business during the decedent's serious illness.

It appears that during said illness the decedent consummated some real estate transactions and purchased valuable properties. Some of these purchases were for the purpose of facilitating or aiding, or the better equipping his transfer business. This is illustrated in the deposition of Edward H. Witte, taken at San Marino, California, July 29, 1950. Mr. Witte, on behalf of his Company, the Witte Engine Works, negotiated a sale to the decedent of a parcel of real estate useful or needful in the business of the Centropolis Transfer Company. In his deposition Mr. Witte quoted the decedent as saying at the beginning of their negotiations, as follows: "Mr. Witte, we need more room, and I wonder if you would lease me or rent me the Bob Smith property?" Later in his deposition, Mr. Witte said: "I understood he wanted it for H. L. Pettyjohn and H. A. Pettyjohn, because he was always speaking of 'my boy.'" This was repeated several times in Mr. Witte's deposition. His understanding of the transaction, or the dominant thought as expressed by him when he said in answer to a question, was: "I knew I was selling it to Centropolis Transfer Company and they were composed of the father and son." The deed to said property was taken in the name of the father and son, namely H. L. Pettyjohn and Harry A. Pettyjohn, or the survivor. By reason of this recital in the deed Harry A. Pettyjohn apparently makes claim to the title of said property. Other property was acquired in similar fashion and the recitals of the conveyancing deeds were as in the Witte transaction. It was the practice of Harry A. Pettyjohn, when he became the executive head of the Company by reason of the illness of his father, to divert funds from the business and to deposit such funds to his own account in banks or to hold same in a safety deposit box. Said funds were used for the purchase of Government Bonds and other securities for himself, and also to invest in real estate. In the latter transactions, he took title to himself or to himself and wife. The question now acutely presented is for this court to say what rights, if any, Harry A. Pettyjohn acquired and is entitled to maintain in the properties, whether acquired out of funds belonging to the business of Harry L. Pettyjohn or in properties where Harry L. Pettyjohn had caused title to be taken in his own name and that of the son.

Where purchases were made by the father and title was taken in his own name and that of the son it is apparently contended that the factual status would be that of a gift and the law pertaining to gifts would therefore apply.

Before discussing the legal phases of the case it should be stated that there was not a line of testimony that Harry L. Pettyjohn designed to discriminate in any way against his wife, now the administratrix of the estate, nor against his grandson, Francis L. Pettyjohn, who was the only child of a deceased son of the decedent.

The decedent left as his heirs, his widow, the defendant Harry A. Pettyjohn, the only surviving son, and his grandson, Francis L. Pettyjohn. So far as this record shows decedent had affection and a proper regard and solicitude for each one of them. One is impressed from the evidence that the decedent was a just and an upright man and was ever mindful of his obligations to those who were the proper objects of his affection and bounty.

Counsel on both sides have prepared and submitted elaborate and extensive briefs. As a postulate, or as postulates, to a consideration of the case, the following should be stated:

1. It is a fundamental rule of law relating to deeds that while age or physical and mental infirmity does not of itself show that the deed of a grantor suffering from such physical and mental infirmity was the product of undue influence, yet when such facts appear the suspicions of equity are aroused, and where found in conjunction

with other matters indicating imposition that may show undue influence, transactions under such circumstances will be scrutinized with great care in courts of equity. The authorities on this question are so numerous that citations are unnecessary. However, see Morris v. Morris, Mo. Sup., 4 S.W.2d 459, loc. cit. 463, where the court said:

"Where the grantor * * * is old and feeble and weak physically and mentally and the giving of his or her property by a deed * * * is secretly brought about and such disposition is an unnatural one, in view of the previously expressed intent, and where there is present the opportunity for the grantee * * * to have exercised undue influence and it was to his or her advantage to exercise such influence, those facts, together with the proof of other facts and circumstances showing a disposition on the part of the one benefiting thereby to poison the mind of the grantor * * * against other relatives, such facts and circumstances are sufficient to establish as a fact the use of such undue influence."

A proper determination of this case, however, does not require a ruling or a decision on the question of undue influence. The property bought by the decedent and taken in the names of himself and his son, Harry A. Pettyjohn, would constitute, as above indicated, a gift. It would follow that the rule relating to gifts would apply.

█ 2. Regardless of all questions of competency on the part of the donor it is the rule that in the case of gifts inter vivos the burden is upon the donee to prove the gift, and, in doing so, he must not only prove the gift itself but the burden is placed upon him of establishing all of the facts and elements essential to the validity of the gift. Again, the cases on this question are legion. In the case of Spencer v. Barlow, 319 Mo. 835, 5 S.W.2d 28, loc. cit. 32, the Supreme Court of Missouri said:

"It is the general rule of law that the burden of proof rests on the party having the affirmative, and in the matter of gifts the law has placed the burden on the donee

of the gift to develop facts showing a right to the property. *Consequently, the burden of proof is on one claiming to be the donee of property to establish all facts essential to the validity of the gift.*" (Emphasis mine.)

This rule is so universal that it seems idle to cite other and additional authorities.

█ 3. With the foregoing as postulates in view, and the principles quoted properly applied, it would appear that the defendant Harry A. Pettyjohn has wholly failed to support by evidence the claim of a gift. Moreover, it was obvious, as above indicated, from the testimony of Mr. Witte, that the whole purpose on the part of decedent was not to make a gift but to improve his business, and since his son had charge of the business because of his illness, it was apparent that decedent thought it necessary, for the purpose of making the business permanent, to carry the title in the names as above indicated, to-wit, in his own name and that of Harry A. Pettyjohn, who then had charge of the business.

█ 4. While the necessity of ruling on the question of undue influence by Harry A. Pettyjohn on his father does not appear, yet, if the question should become material and pertinent, then quite clearly, upon all the evidence in the case, Harry A. Pettyjohn was not only a dominant influence in carrying on the decedent's business, but he was necessarily in position of dominance over his father and unquestionably controlled his will. Numerous acts of Harry A. Pettyjohn justify this conclusion: He diverted funds from the treasury of the business during his father's lifetime, he created and then dissipated joint bank accounts, he bought securities out of the funds of the business and took title in his own name. He did the same thing with real estate. He supervised the allowances made to his father during his illness. While it is true that he was an affectionate son and had a care and a concern for his father, nevertheless, either mistakenly or indifferently, he assumed the right of ownership in his father's business and it was his thought and he often so expressed, that the busi-

ness was a partnership and that his father had only a part interest.

A case relied upon by able counsel for Harry A. Pettyjohn is that of Barnett v. Kemp, 258 Mo. 139, 167 S.W. 546, loc. cit. 552, 52 L.R.A.,N.S., 1185. To use the appropriate language of counsel, the opinion was written by the able and revered Judge Walker. In that case Judge Walker found that the donor, though aged, was of sound mind. Moreover, Judge Walker said:

"there is no allegation of fraud, unfair dealing, or undue influence, *and no intimation that she was not, at all times, of sound mind.*" (Emphasis mine.)

In the very recent case of In re Kaimann's Estate, Mo.Sup., 229 S.W.2d 527, the Supreme Court of Missouri announced applicable principles when it held that a son, surviving his father, has burden of proving alleged gift of father to son in his lifetime. And, furthermore, that a gift by a feeble old man, whose mind is weakened by disease, is presumptively void where relation of trust and confidence exists between donor and donee, and the burden is upon the donee to rebut such presumption by showing that the gift was absolutely fair, valid, and entirely free from taint of undue influence.

■ 5. It is the duty of this court, perforce the provisions of Section 3678, Title 26 U.S.C.A., to enforce the lien of the government where the government has established such lien as in this case.

■ The parties have acknowledged that the lien of the government exists on all of the property involved in this controversy and that the court has and must exercise its jurisdiction to enforce said liens. The parties have stipulated as to the amount of the tax and as to the properties affected by the lien. By paragraph (c) of said Section 3678, in a proceeding of this kind to enforce the Government's tax lien, the court is clothed with authority "to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property and rights to property in question". It will be noted that this is a limited jurisdiction and that this court can only adjudicate rights in respect of the interest of the parties in the property covered by the Government's lien.

Other questions, though presented here, cannot be adjudicated in this proceeding; for instance, this court has no right to make allowances as intimated in the evidence, in behalf of Harry A. Pettyjohn, for services in management of Centropolis Transfer Company. These are matters over which the Probate Court has exclusive jurisdiction.

■ Upon the evidence in this case, at the death of Harry L. Pettyjohn, it became the duty of the administratrix of his estate to take charge of said Centropolis Transfer Company. This is clear from the stipulation of the parties in the decree entered September 28, 1950. Upon that decree it was and now is the duty of the administratrix to take charge of the Transfer Company. It appears that its continuous operation is imperative in order that the estate might be preserved. Under the authorities, the Probate Court of Jackson County, Missouri, may, upon a proper showing, order the continuance of the business. Its continuance would have to be by order of court. Metzger v. Metzger, Mo.App., 153 S.W.2d 118, loc. cit. 121.

Whether Harry A. Pettyjohn, having withheld the business from the administratrix, would be entitled to compensation for his work is a matter to be addressed to the judgment and discretion of the Probate Judge. Whether he should be employed by the administratrix to continue the business is a matter for the Judge of the Probate Court, and his compensation would be a matter wholly within the judgment and discretion of that court. The duty of this court ends with defining the respective rights of the parties.

It should be and will be the decree of the court that all of the property affected in this proceeding be turned over to the administratrix of the estate of Harry L. Pettyjohn. This includes real estate held in the joint names of Harry L. Pettyjohn and H. A. Pettyjohn. It includes property acquired by H. A. Pettyjohn out of the funds of the Centropolis Transfer Company and funds or chattels now in his hands. All

182

of these are to be treated as part of the estate of Harry L. Pettyjohn, and, after the payment of his just debts, including as a prior lien the Government's claim, then distribution will be made conformable to the statute law of Missouri. In the meantime this court will retain jurisdiction of the subject matter in order that the decree enforcing the Government's lien may be carried out.

The parties should submit proposed findings of fact and conclusions of law.