## LOUIS ROSS *vs.* ALBERT C. BURRAGE.

Suffolk.   January 16, 17, 1919. — September 10, 1919.

Present: RUGG, C. J., LORING, BRALEY, CROSBY, & CARROLL, JJ.

*Contract,* Construction.   *Agency,* Existence of relation.   *Equity Jurisdiction,* False representation.   *Words,* "Takes over," "Properties," "As profit."

A letter addressed by a promoter of mining companies to a mining engineer contained the following agreement: "It is understood and agreed by and between us that from the day you last left Boston you are to receive a salary of five hundred dollars a month and when away from Boston your actual travelling expenses, this arrangement to terminate any time upon thirty days notice from either

party. . . . It is further understood that you are to receive in the common shares of each company which takes over, through me, properties in Chile and Peru, other than Ferrobamba, brought to me by or through you, five per cent of such common shares as may come to me as profit by virtue of such taking over." *Held*, that no partnership or fiduciary relation was created by this agreement and that the relation of the writer of the letter to the person addressed was merely that of employer to employee, the five per cent of common shares mentioned being compensation for services in addition to the salary of $500 a month and his travelling expenses when away from Boston.

In interpreting the same contract it was *held*, that the employee was to receive in the common shares of companies which actually had acquired through the writer properties in Chile and Peru brought to him by or through the employee five per cent of such common shares as had come to the writer as profit by virtue of such taking over, and that such percentage was not earned by the acquisition by such companies of an option to purchase not yet exercised.

In a suit in equity brought upon a subsequent contract between the same parties, which cancelled the agreement quoted above, it was *held* to be unnecessary to consider whether a certain provision of the subsequent contract was a misrepresentation of fact or whether, if a misrepresentation, it was a material one, because there was no finding by the master that the plaintiff relied upon the alleged misrepresentation.

BILL IN EQUITY, filed in the Supreme Judicial Court on May 28, 1913, by a mining engineer against a promoter of mining companies to compel the defendant to assign to the plaintiff certain mining shares as described in the opinion.

On June 27, 1913, the case was referred to a master "to hear the parties and their evidence, to find the facts and report the same to the court." The master's report and supplemental report were filed on June 13 and September 23, 1918. The findings of the master material to the decision are stated in the opinion.

The case came on to be heard before *Crosby,* J., and was reserved by him upon the pleadings, the master's report and supplemental report, and the defendant's exceptions thereto for determination by the full court.

*S. L. Whipple & A. Lincoln,* for the plaintiff.

*B. B. Jones,* for the defendant.

LORING, J. This is a bill in equity brought by the plaintiff to compel the defendant to assign to him two hundred and fifty shares in the capital stock of the Chile Exploration Company, being five per cent of the common shares in the capital stock of that company received by the defendant for certain atacamite lands at Chuquicamata, Chile, in accordance with the provisions of the concluding paragraph of the following letter: "London,

England, Sept. 14, 1910.  Louis Ross, Esq., Dear Mr. Ross: — It is understood and agreed by and between us that from the day you last left Boston you are to receive a salary of five hundred dollars a month and when away from Boston your actual travelling expenses, this arrangement to terminate any time upon thirty days notice from either party. . . .

"It is further understood that you are to receive in the common shares of each company which takes over, through me, properties in Chile and Peru, other than Ferrobamba, brought to me by or through you, five per cent of such common shares as may come to me as profit by virtue of such taking over.  Yours very truly, Albert C. Burrage."

In two different places in his report the master has found that the Chuquicamata property here in question was brought to the defendant's attention by others through the plaintiff.  Both findings have been attacked by the defendant.  It seems to us that if these findings are open to attack a finding to the same effect would have to be made upon the subsidiary findings of fact made in the report.  But in the view which we have taken of the case it is not necessary to come to a final decision upon that point.  For we are of opinion, that if the two findings made by the master are to stand or if a similar finding is made by us, the plaintiff is not entitled to the shares he is seeking to recover in this suit.

The material circumstances which have given rise to the suit now before us so far as the legal aspects of the case go are as follows: The defendant is by profession a lawyer.  After thirteen years' practice he retired from the bar in 1897 and devoted himself to mining.  Ten years later he conceived the idea that improvements could be made in the leaching process then in use by which copper is extracted from the ore.  He hoped by these improvements to reduce the cost of extracting copper from ore to such an extent that low grade copper properties which up to that time had not been worked at a profit would become of value.  For this purpose he engaged the services of a chemist Bradley by name.  Being convinced of the ultimate success of the process being developed by Bradley, he determined, in 1909, to acquire large low grade copper properties which had been abandoned as unprofitable.  In the winter of 1909 and 1910 the plaintiff made the defendant's acquaintance in connection with certain mines

and mining properties which he (the plaintiff) had for sale for others. Nothing came of 'this. But in the spring of 1910 the plaintiff (being under contract to go to England to sell some mining securities) suggested to the defendant that while there he might hear of copper properties that would interest him. The defendant told the plaintiff that if he did hear of such properties while in England, he (the defendant) would be glad to know about them. He then explained to the plaintiff in detail the scheme which he had in mind.

While in England the plaintiff devoted a good deal of his time to searching for mining properties of the kind the defendant wished to obtain. In the course of this search the plaintiff made the acquaintance of one Plews, who was the managing director of a company which owned a copper property in Chile, not at Chuquicamata. The plaintiff cultivated Plews's acquaintance and told him that he was trying to obtain for another person low grade copper properties where there was a possibility of great tonnage. The defendant came to Europe in the summer of the same year and while he was there the plaintiff brought Plews and the defendant together. From an inquiry made by the defendant of Plews later on, the defendant learned of the atacamite properties here in question owned by Compania de Cobres de Antofagasta and by the Sociedad Explotodora de Chuquicamata. These properties consisted of about seven hundred and fifty-six acres, two hundred and thirty of which was owned by the Cobres company and five hundred and twenty-six by the Explotodora company. The plaintiff and the defendant were much together while they were in London. On the day before the defendant was to sail for home, the plaintiff suggested to him that he should employ him (the plaintiff) "regularly." As a result of this suggestion the defendant wrote out and handed to the plaintiff on the morning of the day on which he left London to take the steamer for the United States, the letter the material part of which is set forth above. It is not necessary to state in detail what was done thereafter by the defendant personally and through others including the plaintiff. It is enough to say that on March 27 and April 3, 1911, the Cobres company and the Explotodora company executed formal options in favor of the plaintiff upon the lands at Chuquicamata owned by them respectively.

By these options the defendant was given, the right to examine the properties during periods ending nine months from the dates of the respective contracts. If on examination the properties were found to be satisfactory to him, the defendant agreed, within a year of his giving notice to the company in question of his intention so to do, to erect a plant capable of treating two hundred and fifty tons of ore a day and to pay a royalty of twenty-five per cent of the net profits of the undertaking, guaranteeing that the royalty should be not less than £5,000 a year. The defendant was given the further right to buy each property within four years and nine months from the dates of the respective contracts for £50,000 and a ten per cent share in the capital of the company which took over the property in question. The nine months' investigation period was afterwards extended for twelve additional months. During the investigation period the plaintiff in each case was to be lessee of the property.

The defendant was satisfied that the properties owned by these two companies could not be operated successfully unless they were operated together and operated on a large scale; and in addition that a large water power would have to be obtained and brought from a distance to treat the ore by the Bradley process. Further he was of opinion that to make it a well rounded enterprise other adjoining mining properties of smaller extent would have to be obtained. These matters were matters which (among others) were entrusted by the defendant to the plaintiff during three months that he was in Chile, where he went on the defendant's business in 1911.

With a view to procuring the necessary mining organization and the money necessary to carry the adventure through, the defendant had been in negotiation with Daniel Guggenheim, a member of the firm of Guggenheim Brothers of New York, during the year 1911. By January, 1912, the defendant was satisfied that the rights which he had acquired were actually worth at that time "far in excess of $20,000,000," and on January 9 of that year he made a written offer to Daniel Guggenheim in substance to this effect: Daniel Guggenheim within ten days was to organize a corporation to be known as the Chile Exploration Company with a capital stock of ten thousand shares of $100 each, all of which was to be issued to the defendant in payment of the defendant's

options and rights; five thousand shares were to be handed to Daniel Guggenheim and five thousand were to be kept by the defendant. Daniel Guggenheim was to lend to the Exploration company $40,819.73, being the amount theretofore expended by the defendant in the undertaking, and also all money necessary to be expended in the future in making a thorough test of the property. The $40,819.73 was to be repaid by the Exploration company to the defendant. Daniel Guggenheim was to be under an obligation to continue in the enterprise only so long as he thought it advisable to proceed with the investigation. There was a further provision that when Daniel Guggenheim was satisfied that the ores on the property could be treated at a profit, he should organize a corporation to be known as the Chile Copper Company with a capital stock of four million shares of $25 each, one million of which was to be reserved to retire bonds to be issued to raise money for operating the company and the other three million was to retire the stock of the Chile Exploration Company on the basis of three hundred shares of the Copper company for one share of the Exploration company.

This offer was accepted. The Chile Exploration Company was organized. On January 17, 1912, the defendant assigned and conveyed to it all his right and interest: (1) in the option granted to him by the Cobres company; (2) in the option granted to him by the Explotodora company; (3) in two other options (covering smaller acreages) specifically described, and "also in and to all other options, denouncements, petitions, grants, concessions for mines, mill sites, limestone and salt areas, water springs, water power locations at or within fifty miles of Chuquicamata obtained by or for me, directly or indirectly." Thereupon drills were sent to South America and a thorough investigation made of the extent and character of the ore on these Chuquicamata mining properties. The result of this investigation was that on September 10, 1912, Daniel Guggenheim and the defendant, being then in Paris and acting on reports which had been made to them, determined that it was wise to exercise the options. On or about October 3, 1912, the title to the Cobres company property was taken over on payment to it of £90,000 paid and accepted in lieu of £50,000 and a ten per cent share in the capital stock of the company specified in the option, and on October 26, 1912, title to the Explotodora

property was taken over on payment of a like sum, a like agree-
ment having been made with that company. It was intended
that these conveyances should be made to the Chile Exploration
Company. But it was found that the necessary steps had not
been taken to enable that company to hold title to land in Chile
and the conveyances were actually made to third persons in trust
for the defendant who was to hold for the Exploration company.
In his report the master stated that "The Chile Exploration Com-
pany at the close of these hearings on May 4, 1916, still remained
the owner of the Chuquicamata property acquired as above stated
and then was the actual operating company doing business in
Chile."

In the course of a conversation between the plaintiff and the
defendant which took place in April, 1912, the plaintiff stated that
he was entitled to an interest in the Chuquicamata property and
the defendant stated that he was not. The defendant further
stated that the plaintiff did not bring Chuquicamata to the
defendant's attention and knew nothing about it until he, the
defendant, brought it to the plaintiff's attention. The result of
this and conversations which followed it was that on May 6,
1912, a new agreement was made between the plaintiff and the
defendant. So far as is material to the questions which are now
before us for decision that agreement was as follows: It contained
a recital of the execution of the agreement between the plaintiff
and the defendant set forth in the letter of September 14, 1910; a
recital of the fact that the plaintiff "did in the month of Septem-
ber, 1910, by means of certain reports submitted to him by others
bring to the notice of said Albert C. Burrage a certain copper
deposit owned by the Compania de Cobres de Antofagasta at
Chuquicamata in the Republic of Peru in South America, and
also later to other copper deposits in the Chuquicamata District
known as the Aurelia, the Tres Marias, the Riquesa, the Rosario
del Llano, the San Luis, the Flor del Bosque and other mineral
deposits," and a recital to the effect that the plaintiff and the de-
fendant both desired to cancel said understanding and substitute
therefor the following agreement, namely: That on the 6th day of
May, 1913, the defendant should assign to the plaintiff "five
per cent. (5%) of all securities, whether in the form of cash, bonds,
preferred or common shares, accruing in any way to him as net

profit from the exercise of such options on all such properties at said Chuquicamata or any extensions or alterations thereof, or from the sale or transfer thereof to other persons or corporations, or that, instead thereof, at the sole option of said Albert C. Burrage, the said Albert C. Burrage will give, transfer and convey to said Louis Ross the sum of one hundred thousand dollars ($100,000.) cash in the lawful currency of the United States of America, or if said Albert C. Burrage shall not have given, assigned, transferred or conveyed his said options on said properties at said Chuquicamata or his interest therein, then said Albert C. Burrage shall give, assign, transfer and convey to said Louis Ross an undivided one-twentieth ($\frac{1}{20}$) interest in all his said options on or interest in said properties, or, instead thereof, at the sole option of said Albert C. Burrage, an undivided one-twentieth ($\frac{1}{20}$) part of the common shares of a corporation holding such options and interest and the preferred stock of each corporation [which] shall represent at the par value thereof the actual money expended by said Albert C. Burrage for such options and interests, or relating thereto, or the optioning, examining, exploring and developing thereof."

On February 4, 1913, the plaintiff then in England mailed to the defendant a letter dated and written January 17, 1913, complaining of the defendant's treatment of him in regard to Chuquicamata, charging the defendant with misrepresentation and concealment of facts and demanding of the defendant (so far as this case is concerned) five per cent of the common shares of the Chile Exploration Company and its successor the Chile Copper Company. On May 6, 1913, the defendant made tender to the plaintiff's agent of $100,000. This tender was refused. This bill was filed on May 28, 1913. The case was sent to a master on June 27, 1913. The master's report was filed on June 13, 1918, and a supplemental report (on the case being recommitted to him) was filed by the master on September 23, 1918. The case was reserved for the consideration of this court on the master's reports and the defendant's exceptions thereto. No exceptions were taken by the plaintiff.

The plaintiff contended before the master that the agreement of May 6, 1912, was not binding upon him because it was procured by false representations made by the defendant to him.

The master found that "no false representations were made by the defendant to the plaintiff." The plaintiff makes no contention now on the issue of these false representations but he contends that this agreement is not binding on him for other reasons.

The first ground on which the plaintiff now contends that the agreement of May 6, 1912, is not binding on him is that the relation between the plaintiff and the defendant was a fiduciary one and that the defendant failed to make the disclosures due to him from the defendant as one standing in a fiduciary relation to him. The master found in great detail what the defendant knew and what he did not know on May 6, 1912, and what the defendant failed to disclose to the plaintiff at that time. It is not necessary to state these findings in detail. It is enough to say that on these findings there was a failure on the part of the defendant to make such disclosures to the plaintiff as ought to have been made by the defendant if the defendant had stood in a fiduciary relation to the plaintiff. The ground of the plaintiff's contention in this connection is that the concluding paragraph of the letter of September 14, 1910, made the plaintiff and the defendant joint adventurers and brought into being a relation between the plaintiff and the defendant by which the defendant held a fiduciary relation to the plaintiff. This contention is wholly without merit. Nothing is better settled than the doctrine of *Denny* v. *Cabot,* 6 Met. 82. And by the doctrine of *Denny* v. *Cabot,* five per cent of common shares provided for in the concluding paragraph of the letter of September 14, 1910, was compensation to be made by the defendant as employer to the plaintiff as employee in addition to his salary of $500 a month and his travelling expenses when away from Boston. Without question the case at bar comes within the decision in *Denny* v. *Cabot,* and that decision has been continuously affirmed by subsequent decisions of this court and never has been questioned. *Bradley* v. *White,* 10 Met. 303. *Holmes* v. *Old Colony Railroad,* 5 Gray, 58. *Fitch* v. *Harrington,* 13 Gray, 468, 474. *Emmons* v. *Westfield Bank,* 97 Mass. 230, 242. *Ryder* v. *Wilcox,* 103 Mass. 24. *Haskins* v. *Warren,* 115 Mass. 514. *Commonwealth* v. *Bennett,* 118 Mass. 443, 453. *Zeigler* v. *Day,* 123 Mass. 152. *Partridge* v. *Kingman,* 130 Mass. 476. *Estabrook* v. *Woods,* 192 Mass. 499.

The main reliance of the plaintiff in support of the contention that the defendant and the plaintiff were joint adventurers is to

be found in the opinions of Vice Chancellor Howell in *Jackson* v.
*Hooper*, 6 Buch. 185, 197; Vice Chancellor Pitney in *Warwick*
v. *Stockton*, 10 Dick. 61, and of Laughlin, J., in *May* v. *Hettrick*
*Brothers*, 181 App. Div. (N. Y.) 3. There are statements in
these opinions that a fiduciary relation exists between joint ad-
venturers as well as between partners. But there is nothing in
these cases nor in the other cases relied upon by the plaintiff which
even gives color to the contention that an employer who agrees
to pay an employee by way of additional compensation a specified
percentage of the profits of his (the employer's) adventure be-
comes a joint adventurer with the employee. It affirmatively
appears from the opinion of Laughlin, J., in *Stewart* v. *Auerbach*,
148 App. Div. (N. Y.) 222, 223, that that judge was of opinion that
no such relation comes into existence in such a case. The difference
between a joint adventurer and a partner is that in case of a joint
adventure the persons in question are interested in a single ad-
venture, while they are interested in carrying on business together
generally in the case of a partnership. *Denny* v. *Cabot* and the
doctrine established by that case are decisive authorities against
the relationship being that of joint adventurers in a case where
the employer and employee are joint adventurers if not employer
and employee as much as they are decisive authorities against the
relationship being that of partners in a case where they are partners
if not employer and employee. We have examined all the other
cases cited by the plaintiff in this connection and find nothing in
them which calls for further notice.

The next way in which the plaintiff now seeks to get rid of
his agreement of May 6, 1912, is that "the conditions entitling
the plaintiff to a percentage of common shares of the Chile Ex-
ploration Company had been fully performed on May 6, 1912."
If that had been the fact, the result would have been that on
May 6, 1912, the defendant would have held in trust for the plain-
tiff two hundred and fifty of his five thousand shares of the Ex-
ploration company, the bargain of May 6, 1912, would have been a
bargain between a trustee and *cestui que trust* and on the facts
found by the master as to the disclosure or rather non-disclosure
on the defendant's part the bargain could be avoided by the
plaintiff. But we are of opinion that "the conditions entitling
the plaintiff to a percentage of common shares of the Chile

Exploration Company had not been fully performed on May 6, 1912," that on that day the relation of trustee and *cestui que trust* did not exist between the defendant and the plaintiff, but on the contrary that on that day the plaintiff and the defendant were dealing together at arm's length.

On May 6, 1912, the Chile Exploration Company had not taken over "the properties" of the Cobres company and the Explotodora company but options on those "properties." The defendant's promise of September 14, 1910, was to give the plaintiff five per cent of the common shares if any received by him "as profit" on a company taking over the "properties" brought to the defendant (*inter alia*) by others through the plaintiff. That meant and means that, if the defendant succeeded in making a profit in common shares by reason of "properties" brought to him by others through the plaintiff being taken over by a company, the plaintiff should have five per cent of such common shares. On May 6, 1912, "properties" had been brought to the defendant's attention by others through the plaintiff but they had not been taken over by a company at that time. The transaction had not been carried to a conclusion and a profit in common shares realized. The transaction at that time had gone no further than the preliminary stage of options having been obtained and assigned in order that a proper investigation might be made of the "properties" to determine whether the company would or would not take over the "properties." Guggenheim, in consideration of the defendant giving him a half interest in the property, had agreed to advance the money to pay the defendant what he was out of pocket in obtaining the options and the money necessary to make the investigation which had to be made to determine upon the wisdom of taking over the "properties." The machinery adopted by the defendant and Guggenheim to carry this agreement into effect was to organize a corporation to carry on the investigation, and that same corporation was to take over the "properties" in case the investigation showed that it was wise to do so. The plaintiff's right to five per cent of common shares under the agreement of September 14, 1910, was not to come into existence until the options had been exercised and the "properties" taken over. If the agreement of May 6, 1912, had been made after October 26, 1912, when the "properties" of both companies had been con-

veyed to the Exploration company and paid for by it, it is hard to see why the defendant would not have held two hundred and fifty of his five thousand shares in the Exploration company in trust for the plaintiff. But on May 6, 1912, when the agreement between the plaintiff and the defendant was made, the defendant held the five thousand shares of the Exploration company issued to him as his own, and the relation which he bore to the plaintiff was that of a master who had agreed to pay his servant in addition to a salary of $6,000 a year and his travelling expenses when away from home, five per cent of the shares received by him as profit when the "properties" with respect to which the servant was employed had been taken over by a purchaser.

Finally the plaintiff seeks to avoid the effect of the agreement of May 6, 1912, on the ground that the clause in that agreement by which the defendant agreed that if he "shall not have given, assigned, transferred or conveyed his said options on said properties at said Chuquicamata or his interest therein" on May 6, 1913, then in that event the defendant would assign to the plaintiff an undivided one twentieth interest in all his said options on or interests in said properties or instead thereof at the sole option of the defendant an undivided one twentieth part of "the common shares of a corporation holding such options and interest, and the preferred stock of each corporation [which] shall represent at the par value thereof the actual money expended by said Albert C. Burrage for such options and interests, or relating thereto, or the optioning, examining, exploring and developing thereof." The contention of the plaintiff in this connection is that the very insertion of that clause in the agreement was a misrepresentation because on January 17, 1912, the defendant had assigned all his options and interests in the Chuquicamata companies to the Chile Exploration Company. If a promise that if something shall not have taken place which has taken place is a representation that that fact has not taken place, it is hard to see why this is not a misrepresentation of fact. But there is no finding by the master that the plaintiff relied upon this misrepresentation (if it was a misrepresentation) in signing the agreement of May 6, 1912, and on the facts found by the master no such finding should be made by us. It is necessary for the plaintiff to prove that he did rely upon it to make out a right to avoid an agreement by reason of a

misrepresentation.  See, for example, *Harrington* v. *Smith,* 138 Mass. 92; *Fottler* v. *Moseley,* 179 Mass. 295.  Under these circumstances it is not necessary to consider whether under the findings of the master as to what the plaintiff knew and did not know at that time, the misrepresentation was a material one.

The result is that the plaintiff is bound by the agreement of May 6, 1912.  Under that agreement the defendant had the option of paying the plaintiff $100,000 or of transferring to him five per cent of the securities coming to him as profit from the exercise of the options.  This payment or transfer was to be made on May 6, 1913.  Before that date the defendant elected to pay the plaintiff $100,000.  The plaintiff is entitled to a decree directing the defendant to pay him that sum forthwith.  Under all the circumstances of the case no costs should be allowed to either party.

*Decree accordingly.*