JOHN B. SINGLETARY v. W. B. MANN, B. J. HOLSCLAW and BABE HOLSCLAW, his wife, EDITH MANN, EDNA RUTH MANN and JOHN MANN, minors, by and through their next friend, W. E. MANN, and W. E. MANN, individually.

24 So. (2nd) 718          January Term, 1946

February 1, 1946          Division A

*Mabry, Reaves, Carlton, Anderson & Fields, O. K. Reaves, Dewey A. Dye,* for appellant.

*Knowles & Kirk* and *G. B. Knowles,* for appellee.

BUFORD, J.:

Sometime about the year 1932 W. E. Mann, under an agreement with John B. Singletary moved onto a farm near Myakka City, which farm belonged to Singletary. Shortly after Mann moved on this farm Singletary purchased 213 head of cattle and Mann acquired 250 head of cattle. Singletary and Mann entered into an agreement under which the cattle were all to be marked in one mark and were to be run together, Mann and Singletary to be equally interested in the increment and net profits from the handling of the herd.

In 1934 Singletary caused to be fenced several thousand acres of land including and adjoining his farm. Sometime in 1935 Singletary acquired title to the lands fenced and other lands and then caused to be fenced the entire tract amounting to about 9,000 acres. During this period Singletary had bought several hundred additional cattle from time to time which were turned into the same pasture.

In March, 1939, Singletary and Mann came to an agreement in regard to the cattle business under which Mann executed a bill of sale to Singletary conveying to Singletary "all his right and interest in that stock of cattle now on the range near Myakka City, of the County of Manatee and State of Florida, being the range on which the said party of the first part now resides, which said cattle are in the marks and brands following: Marked Crop in one ear, bolt in the other and branded 4——."

"To have and to hold the same unto the said party of the second part, his executors, administrators and assigns forever."

And it was then agreed between the parties that Mann should continue to care for and look after the cattle and receive as his compensation for such service one-half of the net

profits realized from the operation and handling of this herd of cattle.

So the indication is that there was a limited partnership between Singletary and Mann in regard to cattle from 1932 until March, 1939, at which time the partnership arrangements ceased to exist and Mann from thenceforth was agent, servant and employee of Singletary. See 39 C.J. 155, Sec. 209; Gray v. Benning 56 Fed. 1019, affirmed 61 Fed. 651; Flynn v. Fish, 7 Lans. (N. Y.) 117. In this connection see also Ross v. Burrage, 233 Mass. 439, 124 N.E. 267.

From 1934 to and including 1937 W. E. Mann allowed W. B. (Blucher) Mann to turn an aggregate of about 32 head of cattle into the Singletary's pasture under an agreement between the parties, W. E. Mann and W. B. Mann, that W. E. Mann would look after and take care of these cattle for Blucher Mann and that W. E. Mann should have one-half of the increments of such cattle. This was done without Singletary's knowledge or consent. It is true that Singletary learned that Blucher Mann had a few cattle in his pasture but he knew nothing about the arrangement between Blucher Mann and W. E. Mann until about the time of the institution of this suit.

During the years from 1937 to 1942 W. E. Mann and W. B. Mann butchered and sold, or sold without butchering, a great number of cattle taken out of the Singletary pasture without making any accounting whatever to Singletary of such sales. Each claims that the other was to have made the accounting to Singletary.

Sometime early in 1942 W. B. Mann, having acquired title to 2,000 acres of land in Sarasota County (the purchase price of which is shown to have been paid at least in part by the proceeds of the cattle sold by W. E. Mann and W. B. Mann from the Singletary pasture) then sought to remove the cattle which he had put in the Singletary pasture with the alleged increment therefrom to the 2,000 acre pasture. A controversy arose between W. E. Mann and W. B. Mann as to what cattle W. B. Mann was entitled to take and remove from the Singletary pasture to the 2,000 acre pasture. The result of this dispute was that certain persons were agreed

upon between W. E. Mann and W. B. Mann to arbitrate the matter and determine what cattle should be delivered to W. B. Mann, which question the arbitrators proceeded to determine and then separate such cattle and delivered them to W. B. Mann. As near as can be gleaned from the record, 76 head of cattle were so separated and delivered to W. B. Mann. As to all this Singletary had no knowledge or information.

Shortly after this transpired W. E. Mann went to Singletary's office and stated to Singletary in effect that W. B. Mann (contrary to an agreement alleged to have been had between W. E. Mann and W. B. Mann, that the 2,000 acres of land when acquired should be owned jointly by W. E. Mann and his minor children in proportion to their contribution to the purchase price with the proceeds derived from the sale of cattle, and the remaining interest should belong to W. B. Mann) had taken title to the 2,000 acres in the name of W. B. Mann and denied the right of W. E. Mann or his minor children to any interest therein and that W. B. Mann had removed not only the cattle which he had originally turned over to the possession of W. E. Mann but had also taken and removed a large number of cattle which belonged to W. E. Mann and his said minor children and W. B. Mann was denying right of W. E. Mann and his minor children to claim any interest in the said cattle, and also represented to Singletary that W. B. Mann was then in process of negotiating a deal with B. J. Holsclaw for the sale of an interest in, or all of the cattle involved and the sale of an undivided interest in the 2,000 acres of land.

Singletary advised W. E. Mann that the only thing to do under the circumstances was to file a suit against W. B. Mann setting up his claim against W. B. Mann and let the court determine the issues and he offered to introduce Mann to a lawyer who would represent him in such suit. Later Mann came back to Singletary and told him that he had decided to file suit and thereupon Singletary introduced Mann to Alvin B. Rowe and left them together to discuss the matter. The result was that Rowe agreed to represent Mann and file a bill of complaint in his behalf. They agreed upon a retainer and Singletary, at Mann's request and for the account of Mann, paid Rowe the agreed retainer. Rowe prepared a bill of com-

plaint according to the facts given him by W. E. Mann; W. E. Mann verified the bill under oath and it was filed.

The matter came on for hearing and W. E. Mann testified to substantially the same facts that he had told Singletary and which were set up in the bill of complaint, but it developed upon this hearing that the matter of the ownership and identity of the cattle had been submitted to arbitrators and that they had settled the question between the parties and separated and delivered the cattle to W. B. Mann and that an agreement had been reached between W. E. Mann and W. B. Mann that W. B. Mann should make a deed to the SE¼ of the NW¼ of Sec. 18, Twp. 36 South, Range 21 East, either to W. E. Mann's divorced wife or to one of her children for her benefit, and that compliance with this agreement would constitute a settlement between W. E. Mann and W. B. Mann of any claim that W. E. Mann might have by reason of the purchase of the 2,000 acre tract.

At this hearing Singletary learned many things which he had not known before and especially that some 250 head of cattle had been taken from his pasture without his knowledge or consent by W. E. Mann and W. B. Mann and had been sold and disposed of by them, either one or the other or both, and no accounting had ever been made to him for the proceeds of said sale.

Testimony was taken at Sarasota on June 9, 1942.

On June 10th 1942 Singletary filed his petition to intervene. The petition was granted by the court and thereupon Singletary filed his bill of intervention naming all parties who were complainants and defendants in the original suit as defendants to his bill of intervention. All of the defendants answered; W. E. Mann filed an answer and afterwards filed petition to withdraw that answer and to be allowed to file a new answer. The court declined to allow him to withdraw his original answer but allowed him to file an additional answer. The two answers were materially different.

Voluminous testimony was taken, all of which we have carefully considered.

On the final hearing the court entered its decree in which it was held that a fair settlement had been made between the

original plaintiff and W. B. Mann before suit was filed and that the plaintiff W. E. Mann has now reaffirmed that settlement by accepting a deed from W. B. Mann and wife which disposes of the dispute between the original plaintiffs and W. B. Mann. The decree found in favor of Holsclaw and wife and that no party to this suit is entitled to any relief against the Holsclaws. Paragraphs 3, 4, 5, 6 and 7 of the decree are as follows:

"The intervener Singletary is shown to have been W. E. Mann's business associate and confidential advisor and to have counselled the filing of suit and the putting forth of claims made by original plaintiffs on June 1, 1942. These claims are inconsistent with and contrary to those put forth by Singletary in his petition for intervention on June 10, 1942. As an intervener Singletary takes the issues as he finds them, particularly as he had taken part in preparing the original bill. He is estopped to assert the contrary claims which he seeks to assert in his intervention.

"4. The intervener, John B. Singletary, has not established his right to any relief against any other person to this suit. On the contrary, it is shown that said intervener advised the filing of this suit originally and requested Attorney A. B. Rowe (who had been employed by Singletary to represent the plaintiffs) to delay final disposition until Singletary's intervention could be prepared and presented.

"5. The only testimony that W. B. Mann has failed to account properly for cattle butchered is that of W. E. Mann. The same is denied by W. B. Mann. The question of possible indebtedness of W. B. Mann to John B. Singletary and W. E. Mann for failure to account properly for cattle butchered is not an issue in this suit. This decree is without prejudice to the rights of John B. Singletary. or W. E. Mann or both to sue at law upon any such claim against W. B. Mann.

"6. The books of account introduced by intervener Singletary show that his firm (cattle business) has frequently bought cattle from the minor children of W. E. Mann and he is thereby estopped to claim ignorance of the children ownership of cattle.

"7. The lands purchased by W. B. Mann (and involved herein) were not paid for with the proceeds of cattle (as claimed) but with funds furnished by Carl Mann, B. J. Holsclaw and the sale of a small number of W. B. Mann's cattle. The attempt to establish an equity in said lands in favor of plaintiffs and intervener has failed."

The only things involved in this suit were: the question of title to the cattle which were removed from the Singletary pasture and delivered to W. B. Mann by the arbitrators without the knowledge or consent of Singletary, and (2) the legal and equitable ownership of one-half interest in the 2,000 acres of land title to which was taken in the name of W. B. Mann. We say one-half interest because it is shown that Holsclaw acquired one-half interest from W. B. Mann without any knowledge of the adverse claim of Singletary or anyone else.

As it is shown supra, the court found in its final decree that Singletary was estopped from asserting a claim contrary to that which was asserted by W. E. Mann in the original bill of complaint. Therefore, it appears that the court has adjudicated the rights of Singletary (if any he had) upon the theory that he was estopped to assert same.

We hold that this was error. It is clearly shown by the record that the original bill was filed without Singletary's knowledge of the pertinent facts set up in his bill of intervention and that the bill of intervention was filed promptly and on the next day after he had heard the testimony in the court at Sarasota which revealed this state of facts to him.

It is true that Sec. 9 of the 1931 Chancery Practice Act provides:

"Section 9. Interventions. Anyone claiming an interest in the litigation may at any time be permitted to assert his right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding, unless otherwise ordered by the court in its discretion."

The note by Mr. McCarthy under this section in his annotation of the Act, inter alia, says:

"Section 9 authorizes an intervention by anyone claiming an interest in the litigation, not merely an interest in property

in the custody of the court. The federal cases seem to give no satisfactory definition of the term 'interest in the litigation.' In Consolidated Gas Co. v. Newton, (D. C. N. Y.), 256 Fed. 238, it was said that it must be a legal interest; but that definition obviously is not accurate, because one having merely an equitable interest may intervene. See Nelson v. Tropical Land Co. 93 Fla. 203, 111 So. 512, for an example of an intervention by one having an equitable claim. In Caldwell v. Guardian Trust So. (C. C. A. 8) 26 Fed. (2nd) 218, it was said that the interest must be direct and immediate, not remote. Ebersbach v. Ringling, 100 Fla. 1270, 131 Sou. 148, is an example of such remote interest. In Smith v. Gale, 144 U.S. 509, 36 L. Ed. 521, 12 S. Ct. Rep. 674, it was held that the interest must be such that the intervenor will either gain or lose by the direct operation of the decree . . . "

In 39 Am. Jur. Page 950, Sec. 79, it is said:

"Frequently the statutes and rules of practice governing intervention expressly stipulate that intervention shall be in subordination to and in recognition of the propriety of the main proceeding, but aside from any such express declaration the rule is stated to be that one who intervenes in a pending action ordinarily must come into the case as it exists and conform to the pleadings as he finds them or that he must take the case as he finds it. By this it is generally meant that he cannot avail himself of or urge mere irregularities in the proceeding which the original parties have expressly or impliedly waived, or of defenses which are personal to them.

"As a general rule, an intervener is not allowed to assail the jurisdiction of the court or to charge laches on the part of the plaintiff in bringing the suit or to object to pleadings or process which the defendant or other party against whom it is employed has submitted to without objection. Having been permitted to come into the cause because of his interest in the subject matter of the suit, the intervener is restricted to the issue as to such subject matter and cannot insist on raising or trying other issues not involved."

The authorities cited in support of this text show that it properly states the rule.

We find nothing in the record to support the finding that Singletary was Mann's confidential adviser which would in any way preclude Singletary from maintaining this suit. While it is true that Singletary advised Mann to bring the original suit, that advise was unquestionably advanced based solely on the statement by W. E. Mann to Singletary as to the facts and when Singletary found that the facts as stated to him by Mann were not true he had the right to interpose his claim based upon other facts which Mann had not disclosed.

Aside from this, it is not shown that the party claiming the estoppel has been misled by the conduct of the party against whom the doctrine is invoked and that in consequence of such conduct he changed his position to his detriment. This is essential. See 31 C.J. Sec. page 369, Sec. 115; Western Casualty & Security Co. Beaverforden 93 Fed. (2) 166; First National Bank v. Burch, 237 Ala. 680, 188 Sou. 859; Stamp v. Bannings, 221 Mich. 268, 191 N. W. 25; Spitzer v. Branning et ux., 135 Fla. 49, 184 Sou. 770; 21 C. J. page 1221, Note 10. See also Am. Juris. page 732, Sec. 84, and authorities there cited; Henderson v. Mitchell, 75 Iowa 217, 39 N. W. 276, 9 Am. St. 472; Jackson v. Pixley, 9 Cush. (Mass.) 490, 75 Am. Dec. 64; Barnett v. Kemp, 258 Mo. 139, 197 S. W. 546, 62 L. R. A. (N.S.) 1185.

Whatever cattle were acquired by W. E. Mann subsequent to 1933 and prior to March, 1939, as the result of any agreement (not known to Singletary) with anyone to run cattle with the Singletary and Mann herd, under which agreement W. E. Mann was to receive a part of the increment from such cattle, belongs not to Mann individually but to the limited partnership of Singletary and Mann and all such cattle passed to Singletary under the bill of sale of March, 1939. Whatever cattle were so acquired by Mann after the execution of the bill of sale to Singletary belonged to Singletary. This is true because neither a partner, an agent, servant nor an employee may without the partner's or master's or employer's knowledge and consent enter into any business in competition with with his partner, master or employer and make and keep for his individual use and benefit any profit accruing from such transaction. See 47 C.J. 800, Sec. 248; Ann. Cas. 1916E 993,

39 C.J. 124, Sec. 162; Lindsey v. Swift (Mass.) 119 N.E. 787; Connolly v. Road & Bridge District No. 5 et al., 99 Fla. 456; 40 Am. Juris. page 220, Sec. 132, and cases there cited.

Neither could W. E. Mann make any settlement with W. B. Mann involving the division of cattle which would authorize W. B. Mann to take and remove any cattle which belonged to Singletary without the knowledge and consent of Singletary. By such transaction W. B. Mann would acquire no right to such cattle adverse to the rights of Singletary. The knowledge by Singletary merely that some cattle belonging to W. E. Mann and to others were in his pasture would not estop Singletary to assert his claim in this regard. To so estop him it would be necessary for him to be advised of W. E. Mann's agreement in regard to acquiring an interest in the increment from such cattle and to have acquiesced in such arrangement.

Considerable adverse criticism of the conduct of Mr. Singletary and Mr. Rowe, W. E. Mann's original attorney, has been indulged in by opposing counsel and there has been some criticism of the conduct of Mr. Knowles by appellant's counsel. We find nothing in the record except the testimony of W. E. Mann to indicate that either of these parties has been guilty of any misconduct or unethical practice and we think that the testimony of Mr. Mann does not warrant the assertion that there was any misconduct or unethical practice by Mr. Singletary or Mr. Rowe because the record conclusively shows that Mr. Mann is, to say the least, very careless in his regard for truths and facts. In the record before us his testimony on different occasions is diametrically contradictory and many statements he makes are entirely inconsistent with others which he has made under oath. His statements apparently are governed by what he conceives to be his best interest at the time he is testifying, regardless of inconsistencies and contradictions in his own testimony.

We hold that Section 5 of the decree should be modified so that the decree should be without prejudice to either of the parties to maintain suits in *equity* or at law upon any claims not issues in this suit between the parties. The decree confines the remedies available to suit at law. Except as in-

fluenced by the doctrine of estoppel, we hold that the decree of the Chancellor finds adequate support in the testimony.

For the reasons stated, the decree is reversed in part and affirmed in part and remanded to the court below for a reconsideration of the record without application of the doctrine of estoppel and thereupon to enter a supplemental decree, and to modify the decree as above suggested so as to make it without prejudice for either party to maintain suit in equity or in law for the settlement of any claims which either may have not within the issues here presented.

It is so ordered.

CHAPMAN, C.J., TERRELL and ADAMS, J.J., concur.